In the Matter of DANIEL C., an Infant. JAMES N. S. et al., Respondents; C., Appellant; ROBERT ABRAMS, as Attorney-General of the State of New York, Intervenor-Respondent.

Second Department, January 30, 1984

APPEARANCES OF COUNSEL

*Silk & Bunks, P. C.* (*Robert H. Silk* of counsel), for appellant.

*D'Andrea & Goldstein* (*Robert Goldstein* of counsel), for respondents.

*Robert Abrams, Attorney-General* (*George D. Zuckerman* and *Florence E. Abrams* of counsel), intervenor-respondent *pro se.*

LAZER, J. P.

Following strong manifestations of public discontent with the judicial result in the notorious Baby Lenore case where a mother who revoked her consent to adoption was successful in obtaining an order for the child's return (see *People ex rel. Scarpetta v Spence-Chapin Adoption Serv.*, 28 NY2d 185), the Legislature enacted section 115-b of the Domestic Relations Law in an effort to avoid the occurrence of similar tragic experiences in the future. Properly invoked, the new section limits the right to revoke a consent to adoption to a 30-day period and limits the revoking natural parent's remedy to a hearing to determine whether the best interests of the child would be served by return of the child or by adoption. Dissatisfied with the results of her effort to revoke her consent and to obtain the child's return, the natural mother challenges the constitutionality of section 115-b, its interpretation by the Surrogate's Court, and that court's finding that the best interests of the child will be served if he remains with the adoptive parents. We conclude that the challenge must fail.

I

During her sixth month of pregnancy, C., the natural mother, who was then 20 years old and unmarried, sought her obstetrician's assistance in placing the forthcoming child for adoption. The doctor contacted an interested young childless couple and preliminary arrangements for the adoption commenced. C., who was then residing with her parents and attending college in New York City, planned to leave the city, give birth, turn the child over to the adoptive parents and then return home to her parents, who were unaware of the pregnancy.

In furtherance of her plan, C. retained a lawyer and on December 11, 1981, two days after the birth of her son, signed a consent to his adoption in order to permit the adoptive parents to take possession of the child. At her lawyer's office on January 20, 1982, C. signed the extrajudicial consent form that she now attacks. Supplied to all Family and Surrogate's Court Judges and clerks by the Administrative Board of the Judicial Conferences, the

consent form states on its face that it shall become irrevocable 30 days after commencement of the adoption proceeding unless revoked within that time. The form closely tracks the language of that portion of section 115-b of the Domestic Relations Law, which provides: "Such consent shall, if it shall so state, become irrevocable thirty days after the commencement of the adoption proceeding unless written notice of revocation thereof shall have been received by the court within said thirty days" (Domestic Relations Law, § 115-b, subd 1, par [d], cl [i] as added by L 1972, ch 639).

The relevant portion of the consent form reads as follows: "I, _____, residing at _____, natural [*Mother*] [*Father*] of _____ do hereby irrevocably Consent to the Private Placement Adoption of my [*daughter*] [*son*] _____, born _____. I understand that in the event that this Consent is not executed before a Judge of the _____ Court, of the County of _____, then and in that event this Consent shall become irrevocable thirty days after the commencement of the adoption proceedings unless written notice of revocation thereof shall be received by this Court within said thirty days" (see 10 West's McKinney's Forms, Matrimonial and Family Law, § 14:86E [1983 Pocket Part]).

The adoption proceeding was instituted in the Westchester County Surrogate's Court on March 24, 1982, but six days later C. filed a notice of revocation of consent which the adoptive parents immediately resisted. Acting pursuant to the statute, the Acting Surrogate conducted a hearing to determine whether the revocation was in the child's best interest (see Domestic Relations Law, § 115-b, subd 3, par [d]). In her memorandum to the trial court, C. urged that section 115-b be declared unconstitutional because the language it requires to be inserted in the consent form, if the right to revoke is to be limited, proffers the impression that timely revocation will nullify the consent absolutely, while all it actually directs is a hearing concerning the best interests of the child, at which the natural parent derives no advantage from parenthood (see Domestic Relations Law, § 115-b, subd 1, par [d]).

During the hearing, the parties focused on best interests, an issue which consumes nearly all of the almost 500 pages

of transcript. Although the constitutional question was raised, the transcript contains no claim by C. that she was misled by the consent form. In the course of direct examination of C.'s obstetrician, counsel for the adoptive parents sought to explore C.'s knowledge of the meaning of the consent by inquiring concerning her conversations with the doctor. C.'s attorney objected to this inquiry, asserting the physician-patient privilege. Arguing for disclosure, the adoptive parents responded that the conversations sought to be disclosed did not relate to treatment but to the adoption itself. The following colloquy then occurred between the court and C.'s attorney:

"THE COURT: Mr. Papantonio, you seem, in your brief, your trial memorandum, to also allude to some type or the possibility of fraud or at least a misunderstanding on the part of your client of what she was signing.

"MR. PAPANTONIO: I don't believe that we did. We did not intend to create that impression in our memorandum, sir.

"THE COURT: You see, you talk about the form being improper and misleading and —

"MR. PAPANTONIO: We are attaching [sic] the constitutionality of that act and the forms prepared under that act.

"THE COURT: But you are not claiming that there is any — that she was mislead by the form?

"MR. PAPANTONIO: No, sir.

"THE COURT: Oh, if you are not, then the objection is sustained".

Although counsel for the adoptive parents continued to press for exploration of the mother's understanding, arguing that C.'s conversations with the obstetrician included one that occurred on the day the extrajudicial consent was signed, the court continued to sustain objections on the ground that C. had conceded that she had not been misled.

Testifying on her own behalf, C. declared that she had read the consent form before signing it at her attorney's office; that she knew it would be filed in the Surrogate's Court and become irrevocable after 30 days; "that the adoption would not be completed until [she] signed a consent [before] the Surrogate"; that "I knew that I had a certain amount of time, even after I signed that paper";

and that "as far as I knew that an order [*sic*], after the consent was filed, I had 30 days in which to revoke the consent". On cross-examination C. told the court that her lawyer was present when she signed the consent form and that "he explained it to me". It is quite apparent that C.'s subsequent decision to revoke the consent was based in part on her parents' supportive reaction to her revelation of the child's birth.

The court denied C.'s application to withdraw her consent, finding that revocation would not serve the best interests of the child (see *Matter of Daniel C.,* 115 Misc 2d 130). While the Acting Surrogate recognized that a lay person "could easily infer from the language of the form that * * * the consent * * * could be revoked and upon revocation the parties would be restored to a *status quo* position" (*Matter of Daniel C., supra,* p 133), it found that C. had not been misled by the form, that she had understood the consequences of her act and that she had been represented by competent counsel. Therefore, she had not been deprived of due process.

On appeal, C.'s new counsel makes an entirely new contention — that as a matter of judicial construction section 115-b must be found to require the consent form to inform the signer concerning the actual legal consequences of a notice of revocation. If section 115-b is not interpreted to require a full explanation in the consent form, argues C., it is unconstitutional and her due process rights have been violated by use of the deceptive form. Also challenged is the Acting Surrogate's finding that revocation is not in the best interests of the child.

II

Before reaching our dispositive analysis, we pause briefly to describe the legislation dealing with private placement adoptions, a statutory scheme which must be strictly construed (see Domestic Relations Law, § 110; *Dennis T. v Joseph C.,* 82 AD2d 125). In the Baby Lenore case, which preceded the enactment of section 115-b, the Court of Appeals construed the adoption statutes as providing the judiciary with discretion to permit revocation of adoption consents at any time until the final order of adoption (see *People ex rel. Scarpetta v Spence-Chapin Adoption Serv.,* 28

NY2d 185, *supra*). Responding to the public outcry created by Baby Lenore, the Legislature created a private placement procedure intended to limit the right to revoke consents. Section 115-b (subd 1, par [c]) provides that where a consent has been executed before a Judge of the adoption court "no action or proceeding may be maintained by the consenting parent for the custody of the child to be adopted, and no such consent shall be revoked by such parent if * * * [the] consent states that it shall become irrevocable upon * * * execution". Where, as here, the consent form has not been executed before a Judge, it becomes irrevocable 30 days after the commencement of the adoption proceeding "if it shall so state" unless written notice of revocation is received by the court within 30 days after the adoption proceeding has commenced (Domestic Relations Law, § 115-b, subd 1, par [d], cl [i]). Thus, whether or not executed before a Judge, if the right to revoke is to be limited, the consent form must state when it becomes irrevocable. There are no words in the statute that require an extrajudicial consent form to contain an explanation of the legal consequences of a timely revocation that is resisted by adoptive parents. In a clause that follows the provisions requiring the time of irrevocability to be stated in the consent form, the statute provides that a resisted revocation that is timely will result in a best interests hearing at which the natural parent has no right superior to that of the adoptive parents (Domestic Relations Law, § 115-b, subd 1, par [d], cl [ii]).

Although the instant consent form constitutes an almost verbatim transcription of the relevant portion of section 115-b, C. argues that the statute really requires "that all consents recite on their face the substance of the statute itself". The best refutation of that claim is the actual language of the statutory paragraph dealing with the effect of a notice of revocation. That language imposes no requirement that the contents of the paragraph or its substance be inserted in the form; indeed, it makes no reference to the consent form at all (Domestic Relations Law, § 115-b, subd 1, par [d], cl [ii]). What other paragraphs of section 115-b do require to be inserted in the consent form is a statement of the name and address of the

adoption court and, if revocation is to be limited, that there be a further statement that the consent becomes irrevocable after 30 days (Domestic Relations Law, § 115-b, subd 1, pars [a], [d], cl [i]).

We do not agree that as a matter of statutory construction section 115-b must be deemed to require all of its relevant provisions to be inserted in the consent form. A statute must be construed according to the ordinary meaning of its words (*Riegert Apts. Corp. v Planning Bd.,* 57 NY2d 206) and resort to extrinsic matter, such as the legislative history, is inappropriate when the statutory language is unambiguous and the meaning unequivocal (*Giblin v Nassau County Med. Center,* 61 NY2d 67; *Sega v State of New York,* 60 NY2d 183; *New Amsterdam Cas. Co. v Stecker,* 3 NY2d 1). Where, as here, a statute is clear, a court should not attempt to cure an omission in the statute by supplying what it believes should have been put there by the Legislature (*Eastern Paralyzed Veterans Assn. v Metropolitan Transp. Auth.,* 79 AD2d 516, app dsmd 52 NY2d 895; McKinney's Cons Laws of NY, Book 1, Statutes, § 363) for the judiciary should not substitute its wisdom for that of the Legislature (*Nettleton Co. v Diamond,* 27 NY2d 182, 194; *Meltzer v Koenigsberg,* 302 NY 523). Regardless of the contents of any memorandum written by a drafter of legislation, the legislation stands for what its words manifest and not the inner thoughts of a draftsman (see *People v Graham,* 55 NY2d 144, 151; McKinney's Cons Laws of NY, Book 1, Statutes, § 76). This is especially true because " 'there is no necessary correlation between what the draftsman of the text of a bill understands it to mean and what members of the enacting legislature understand' " (*People v Graham, supra,* p 151, citing 2A Sutherland, Statutory Construction [4th ed], §§ 48.09, 48.12). Since the Legislature made its intent clear when it mandated the insertion of particular information in the consent form, the absence of any provision that the entire statute be explained in the form demonstrates an intent not to require more detailed information in the form.

## III

Faced with the clear language of the statute, C. posits the further contention, that absent the judicial construc-

tion she suggests, the statute is unconstitutional. We see no need to reach her rather complex due process arguments, because C. lacks the standing to raise them.

Under settled standing principles, those who challenge a statute as unconstitutional must demonstrate actual or threatened injury to a protected right (see *Duke Power Co. v Carolina Environmental Study Group,* 438 US 59; *People v Parker,* 41 NY2d 21; *Matter of Donohue v Cornelius,* 17 NY2d 390, 397; *People v Merolla,* 9 NY2d 62) and that they have been aggrieved by the unconstitutional feature of the statute (see *Ulster County Ct. v Allen,* 442 US 140; *Oriental Blvd. Co. v Heller,* 27 NY2d 212; *People v Beakes Dairy Co.,* 222 NY 416). Constitutional litigants are not ordinarily entitled to raise the unconstitutionality of a statute as it is applied to others (see *United States v Raines,* 362 US 17; *American Power Co. v Securities & Exch. Comm.,* 329 US 90; *People v Parker, supra; People v Drayton,* 39 NY2d 580; *People v Merolla, supra; O'Kane v State of New York,* 283 NY 439; *Matter of Anonymous,* 55 AD2d 383).

On this record, it is quite apparent that C. was not directly aggrieved by the alleged defect in section 115-b. Her testimony that she believed she had 30 days in which to revoke her consent does not imply that she was unaware of the consequences of revocation since she later admitted that the statute had been explained to her by her lawyer. She is bound by her position at the trial as expressed by her lawyer who explicitly conceded that C. had not been misled by the consent form. This concession — a formal judicial admission that she was not misled — was deliberately made for the express purpose of limiting and defining the facts in issue (see Fisch, NY Evidence [2d ed], § 803; McCormick, Evidence [2d ed], § 266) and was successful in preventing the adoptive parents from exploring C.'s knowledge of the effects of revocation. Since the admission is conclusive on C. (see *Coffin v President & Directors of Grand Rapids Hydraulic Co.,* 136 NY 655; *Burdick v Horowitz,* 56 AD2d 882; Richardson, Evidence [Prince, 10th ed], § 216), she has suffered no injury in fact from the allegedly misleading language in the consent form nor has she been otherwise prejudiced by the assertedly unconstitutional feature of section 115-b.

In holding as we do, we have considered whether there is an exception to the injury-in-fact requirement for standing (see *United States v Raines,* 362 US 17, *supra*) which would permit C. to pursue her constitutional thrust. Exceptions relating to the First Amendment area (see, e.g., *Gooding v Wilson,* 405 US 518) or where there is a close nexus between the present party and the person(s) whose constitutional rights are alleged to be violated (see, e.g., *Griswold v Connecticut,* 381 US 479; *Barrows v Jackson,* 346 US 249) are not relevant to this case. Neither is the void-statute exception under which a statute may be attacked by someone otherwise affected by it but not aggrieved by its unconstitutional feature. The exception is available if the statute can be found unconstitutional as to others not before the court and the constitutional and unconstitutional features cannot be meaningfully severed, thus rendering the entire statute invalid (see *Aptheker v Secretary of State,* 378 US 500; *United States v Raines, supra,* p 23; *Thompson v Wallin,* 276 App Div 463, affd 301 NY 476, app dsmd 342 US 801; cf. *People v Lathrop,* 3 NY2d 551; *Bronx Gas & Elec. Co. v Maltbie,* 268 NY 278; see, also, Sedler, The Assertion of Constitutional Jus Tertii: A Substantive Approach, 70 Cal L Rev 1308, 1323-1326; Tribe, American Constitutional Law, pp 106-107; 16 CJS, Constitutional Law, § 76, p 241). Under the void-statute exception, a facial challenge to a statute may be made by a person not aggrieved by the unconstitutional feature of the law if the constitutional sections cannot be given legal effect without the unconstitutional ones or when the valid operation of the statute is so restricted by nullification of the unconstitutional feature that the Legislature would not have intended the valid provisions to stand with the invalid provisions stricken (see *United States v Raines, supra; Dorchy v Kansas,* 264 US 286; cf. *F.T.B. Realty Corp. v Goodman,* 300 NY 140; *Fougera & Co. v City of New York,* 224 NY 269; see, also, 2 Antieau, Modern Constitutional Law, § 15:35; Stern, Separability and Separability Clauses in the Supreme Court, 51 Harv L Rev 76). The test, applied with liberality in this State, is whether, if partial invalidity had been foreseen, the Legislature would have desired that the statute be enforced with the invalid part eliminated or whether it would then have

rejected the statute altogether (see *People ex rel. Alpha Portland Cement Co. v Knapp,* 230 NY 48, 60; see, also, *People v Mancuso,* 255 NY 463; *Schieffelin v Goldsmith,* 253 NY 243).

Here the void-statute exception is not available to provide standing to C. because the statute can survive without the allegedly offending provisions of section 115-b. If the provisions of the statute applicable to extrajudicial consents are void, they can be severed, leaving other valid provisions which would still permit private placements where the consent has been executed before the adoption court or where the extrajudicial consent contains no language concerning irrevocability. Thus, if paragraph (d) of subdivision 1 of section 115-b were deleted, a viable scheme for private placement adoption would still remain, while to strike all of section 115-b because of the existence of the challenged paragraph would extinguish all statutory authority for private placements based on consent and jeopardize the validity of all such adoptions currently in process. We conclude that the void-statute exception is not available to C. (see *People v Lathrop, supra; Bronx Gas & Elec. Co. v Maltbie, supra; Grossman v Baumgartner,* 22 AD2d 100, affd 17 NY2d 345).

We are aware, of course, that State courts can follow their own jurisprudence in determining whether a party has standing to raise a Federal constitutional question (see *Bateman v Arizona,* 429 US 1302; *Doremus v Board of Educ.,* 342 US 429; *Venditti v Incorporated Vil. of Old Westbury,* 89 AD2d 960) and New York generally has shown a more permissive attitude toward standing than the Federal judiciary (see, e.g., *Matter of District Attorney of Suffolk County,* 58 NY2d 436; *Matter of Morgenthau v Cooke,* 56 NY2d 24; *Boryszewski v Brydges,* 37 NY2d 361; *Matter of Douglaston Civic Assn. v Galvin,* 36 NY2d 1; *National Organization for Women v State Div. of Human Rights,* 34 NY2d 416). One major rationale for this liberal policy — the desire to prevent a barrier to judicial scrutiny of legislative action (see, e.g., *Matter of Feight v Lesser,* 58 NY2d 101, 106; *Boryszewski v Brydges, supra*) — would not be furthered by granting standing to C. because there is no reason why others who may actually be aggrieved by

section 115-b will be unable to assert their own claims. While the liberal zone of interest test for review of administrative action (see, e.g., *Matter of Bradford Cent. School Dist. v Ambach,* 56 NY2d 158; *Matter of Morgenthau v Cooke, supra; Matter of Douglaston Civic Assn. v Galvin, supra*) does not apply to challenges to legislative enactments, even in the administrative cases some cognizable injury has been demonstrated by the party challenging the administrative action.

Where the merits of appeals actually have been reached because of the recurring nature of publicly significant questions constantly rendered moot by the time they reach the appellate level (see, e.g., *People ex rel. Donohoe v Montanye,* 35 NY2d 221; *Matter of Gold v Lomenzo,* 29 NY2d 468; *East Meadow Community Concerts Assn. v Board of Educ.,* 18 NY2d 129) or because a significant public question has recurred and the Appellate Divisions are divided (see, e.g., *People v Parker,* 41 NY2d 21, 25, *supra*), there have been no significant countervailing interests to reaching the substantive issue. To ignore standing principles here because of C.'s personal misfortune not only would create a new exception to standing requirements but it could result in grave and perhaps tragic consequences to others currently involved in the adoptive process. Although we have not reached the merits of the constitutional issue, we note that a declaration that the extrajudicial consent portions of section 115-b are unconstitutional would be applicable to all such adoptions not yet finalized (see *Matter of Jessica XX,* 54 NY2d 417, 424). Any attempt to limit the effect of such a declaration by restricting it to consents executed in the future would place us in the untenable position of declaring that the statute (or some portion of it) is unconstitutional because it authorizes misleading consent forms while at the same time precluding all persons who have executed consents under the void statute from challenging it — with the exception of C., who was not aggrieved by the statute or the form.

## IV

Finally, we turn to our colleague's dissenting opinion and direct our attention solely to those of his contentions

which have not been the subject of previous discussion in this opinion.

We cannot agree with Justice GIBBONS that the adoptive parents waived the issue of standing or that it was even waivable. In contending that "the Court should not reach the issue as to the correctness of the form" because of the concession made by the mother's attorney, the adoptive parents clearly attacked C.'s standing. In any event, lack of standing in the context of the constitutionality of a statute is not a matter for waiver by parties, for it is the courts which must decide whether the parties have a sufficient stake in the litigation to necessitate constitutional adjudication, and one party does not have the ability to confer standing upon another. *Matter of Prudco Realty Corp. v Palermo* (60 NY2d 656), cited in the dissent, is inapposite because it merely held that an administrative agency's failure to raise the standing question with respect to review of an administrative determination waived any objection to standing.

Further, we see no basis to upset the formal judicial admission made by the lawyer who represented C. at the hearing. Although a party may be relieved from the terms of a stipulation made in open court by her attorney when it is evident that the attorney's understanding of the stipulated terms differs obviously and radically from the perception of the adversarial party (see *Matter of O'Brien v Assessor of Town of Mamaroneck,* 20 NY2d 587; *Matter of Way v Town of Poughkeepsie,* 75 AD2d 602), none of the instant litigants claim that the attorney did not understand the import of his concession. When the obstetrician was asked to reveal the contents of C.'s conversations with him concerning the adoption, her lawyer objected and made the categorical declaration that his client was not misled by the consent form. He thus succeeded in excluding presumably damaging evidence and we cannot perceive how he could have misconceived the import of his straightforward declaration.

We also disagree with our colleague's assertion that the admission was not binding because C.'s lawyer should have been disqualified on the ground that his testimony was necessary on the issue of C.'s awareness of her rights and

because his conduct at trial advanced his own interests in escaping the consequences of his "failure to apprise" C. of her rights. While it is highly questionable whether a civil judgment can be overthrown by a posttrial claim of conflict of interest, here C. herself has made no such claim, and it would be highly unfair for this court, *sua sponte* on this record, to find her attorney guilty of such conduct. We are obligated to respect a party's choice of trial counsel (*People v Gomberg,* 38 NY2d 307, 312) and we should not readily interfere with an attorney-client relationship (see, also, *Matter of Schumer v Holtzman,* 60 NY2d 46). To presume that C.'s trial counsel did not testify that C. was misled by the form because he had a conflict of interest is to make a factual determination that she was misled in the face of (1) her admission that the statute had been explained to her; (2) her lawyer's declaration in her presence that she was not misled; (3) the Acting Surrogate's finding that she was not misled; and (4) the absence of any claim by her present counsel or his client that his predecessor should have testified. On this record, there is no basis for a finding that the lawyer performed otherwise than in accordance with ethical requirements and we find no basis either to criticize or condemn him.

In sum, C.'s unhappiness should not be transformed into a multiple tragedy for others currently engaged in the adoptive process; nor should this case become the springboard for returning the State to the deplorable situation that prevailed before the enactment of section 115-b. The Acting Surrogate found the best interests of the child were served by adoption. We are in accord with that conclusion. If the statute has defects, the cure is with the Legislature.

Accordingly, there should be an affirmance.

GIBBONS, J. (dissenting). This is an adoption proceeding which is contested by the natural mother, appellant Claire C. Claire was 20 years old when she became pregnant with the child Daniel C. At the time, she lived with her parents in The Bronx and was a senior in college. She was not

married. Claire is a Roman Catholic and is apparently quite devout. Feeling ashamed, she did not tell her family about her pregnancy. However, because of her religion and because of a growing love for the unborn child, she did not consider the possibility of abortion. The best alternative left to her, as she saw it then, was to have the baby and then to put it up for adoption, with her parents never knowing of its existence.

Apparently in a quandary because of the dilemma she was facing, Claire did not see an obstetrician until her sixth month of pregnancy. Not wishing to see a doctor in circumstances where word might get out to friends or family, Claire looked for a doctor in the Westchester County phone book. She chose Dr. John Mastrantonio and his associates, "because they did not advertise abortions". She saw Dr. Mastrantonio for the first time on September 23, 1981, at which time he estimated that the baby would be born in the first week of December. Claire spoke to the doctor about her wish to give the child up for adoption. The doctor contacted Mr. and Mrs. S., petitioners-respondents herein, as prospective adoptive parents. Dr. Mastrantonio also referred Claire to an attorney, Edward Papantonio.

Wishing to continue to keep her pregnancy a secret, Claire devised a plan whereby she would temporarily drop out of school, leave The Bronx, give birth, turn the child over to the adoptive parents, and then return home. She was able to do this, with Mr. and Mrs. S. referring her to a woman in Newburgh, New York, with whom she lived until the baby was born.

The baby, Daniel C., was born on December 9, 1981, the delivery being performed by one of Dr. Mastrantonio's associates. Claire turned the baby over to a representative of the adoptive parents on December 12, as she was leaving the hospital where the delivery had taken place.

On January 20, 1982, Claire signed an "irrevocable consent" form in her attorney's office. The form, which is an official form used by the Surrogate's Court (see *Matter of Daniel C.*, 115 Misc 2d 130, 131), reads as follows:

"Form 702A- Irr. Consent before Notary

"STATE OF NEW YORK

"SURROGATE'S COURT, COUNTY OF WESTCHESTER

---

"In the Matter of the Adoption of

    DANIEL C.

    Adoptive Child    IRREVOCABLE CONSENT

---

"I, CLAIRE C., residing at Newburgh, New York, natural (mother) of DANIEL C. do hereby irrevocably consent to the Private Placement Adoption of my (son) DANIEL C. born on December 9, 1981. I understand that in the event that this Consent is not executed before a Judge of the Surrogate's Court of the County of Westchester, then and in that event this Consent shall become irrevocable thirty days after the commencement of the adoption proceeding unless written notice of revocation thereof shall be received by this Court within said thirty days.

"The name and address of the Court in which the adoption proceeding is to be commenced is: Surrogate's Court, County of Westchester, "Address: County Courthouse, 111 Grove St., White Plains, New York 10601.

                CLAIRE C.
                Natural (mother)

"STATE OF NEW YORK    )

"COUNTY OF WESTCHESTER  )  SS:

"On this 20th day of January, 1982, before me personally came CLAIRE C. to me known and known to me to be the person described in and who executed the foregoing instrument and she duly acknowledged to me that she executed the same.

                Edward Papantonio
                Notary Public

"I also hereby acknowledge receipt of a conformed copy of this irrevocable consent which was delivered to me by EDWARD PAPANTONIO this 20TH DAY OF JANUARY, 1982.

                CLAIRE C.
                NATURAL (MOTHER)".

At the time she signed the form, Claire wanted to tell her family about the whole matter, but, again, because of her

sense of shame and to avoid causing her family worry, she kept quiet. Finally, after much soul-searching, Claire decided that she wanted her child back. She had always felt uncertain and guilty about giving him up. As time went by she began to feel more and more definitely that she wanted her baby. Finally, she made the decision to revoke her consent to the adoption, and, on March 22, 1982, told her family about the child and that she was going to keep him. The family was very supportive. The same day Claire called her attorney and told him that she was revoking her consent.

Two days later, on March 24, 1982, Mr. and Mrs. S., the adoptive parents, initiated adoption proceedings with the filing of a petition. A notice of revocation of consent was filed by Claire, and on April 7, 1982, the adoptive parents filed a notice indicating that they were contesting the revocation of consent. The matter of Daniel C.'s adoption came on for a hearing pursuant to subdivision 3 of section 115-b of the Domestic Relations Law before Acting Surrogate MARTIN, in the Westchester County Surrogate's Court. Claire was represented at the hearing by Edward Papantonio.

In a memorandum of law submitted before the hearing, Claire's attorney argued that section 115-b of the Domestic Relations Law was unconstitutional insofar as it allowed the issue of whether or not a child should be adopted to turn on a best interests of the child test, without finding that the natural parent or parents were "unfit and/or neglectful" (see Domestic Relations Law, § 115-b, subd 3, par [d], cl [v]). Mr. Papantonio also contended that the official irrevocable consent form signed by Claire is constitutionally defective in that it does not indicate that a timely revocation can be contested by the prospective adoptive parents. In that regard Mr. Papantonio categorically asserted that "[t]he evidence at trial will show that the natural mother, upon executing the form, was absolutely certain that she could revoke the document at any time up to thirty (30) days after the petition for adoption was filed; and that upon filing such revocation, the proceeding would end and the child would be returned to her". Similarly, with respect to the sufficiency of the form, Mr. Papantonio,

citing our decision in *Matter of Male M.* (76 AD2d 839, mot for lv to app den 50 NY2d 1056), also maintained that the form signed by appellant did not comply with the requirements of section 115-b. Finally, Claire's attorney contended that she was a fit mother and that it was in the child's best interests to be returned to her.

The trial court held that the adoption should be permitted (*Matter of Daniel C.,* 115 Misc 2d 130, *supra*). Acting Surrogate MARTIN found that while the official form was misleading and should be revised, the natural mother in this case was not misled (*Matter of Daniel C., supra,* pp 133-134). In regard to the latter issue, he noted that Claire had an attorney when she signed the consent and that no testimony had been presented as to what her attorney had told her concerning her rights under section 115-b. The court went on to hold that section 115-b was constitutional, and that, while Claire was a loving and intelligent young woman, it would be in Daniel's best interests to be adopted by the prospective adoptive parents (*Matter of Daniel C., supra,* pp 134-140).

To prosecute her appeal the natural mother has retained new counsel. Contrary to what is said in the majority opinion, on appeal, Claire does not contend that section 115-b of the Domestic Relations Law is unconstitutional. Rather, the central thrust of her appeal is that her consent was not an informed one and that the official form does not comport with the requirements of section 115-b and is in violation of the constitutional rights of a parent. She further maintains that, since the consent was invalid, the child cannot be taken away from her without a finding of gross misconduct on her part. These contentions, also contrary to the view of the majority, were raised, as aforestated, in Claire's trial memorandum.

The trial court avoided having to rule on the legal sufficiency of the consent form by finding, as already noted, that Claire was not misled by the form. My colleagues in the majority achieve a similar result by holding that Claire's lawyer made a "formal judicial admission" that she was not misled, precluding any further inquiry into that subject. My colleagues then conclude that Claire lacks standing to question the legal sufficiency of the form.

I would reverse and order the immediate return of the child to his natural mother, on the ground that the consent form signed by appellant was defective.

Section 115-b of the Domestic Relations Law, entitled "Special provisions relating to consents in private-placement adoptions", reads as follows:

"1. If a duly executed and acknowledged consent to a private-placement adoption shall so recite, no action or proceeding may be maintained by the consenting parent for the custody of the child to be adopted, and no such consent shall be revoked by such parent if:

"(a) The consent sets forth the name and address of the court in which the adoption proceeding is to be commenced; and

"(b) A copy of such consent was given to such parent upon the execution thereof; and

"(c) The consent was executed or acknowledged before a judge or surrogate of the court in which the adoption proceeding is to be commenced and such consent states that it shall become irrevocable upon such execution or acknowledgment; or

"(d) The consent was not executed or acknowledged before a judge or surrogate of the court in which the adoption proceeding is to be commenced, in which case,

"(i) Such consent shall, if it shall so state, become irrevocable thirty days after the commencement of the adoption proceeding unless written notice of revocation thereof shall have been received by the court within said thirty days.

"(ii) Notwithstanding that such written notice shall have been received within said thirty days, the notice of revocation shall be given effect only if the adoptive parents fail to oppose such revocation, as provided in subdivision three of this section, or, if they oppose such revocation and the court as provided in subdivision three of this section shall have determined that the best interests of the child will be promoted by giving force and effect to such revocation.

"2. At the time that a person appears before a judge or surrogate to execute or acknowledge a consent to adoption, the judge or surrogate shall inform such person of the

consequences of such act pursuant to the provisions of this section.

"3. (a) A parent may revoke his consent to adoption only if it has not become irrevocable under the provisions of this section and only by giving notice, in writing, of such action to the court in which the adoption proceeding has been or is to be commenced. Such notice shall set forth the address of the parent and may, in addition, set forth the name and address of the attorney for the parent.

"(b) If, at the time of filing of the petition for adoption, or within thirty days thereafter, the court has received or shall receive such notice of revocation, the court shall promptly notify the adoptive parents, by notice in writing to them and to their attorney, of the receipt by the court of such notice of revocation.

"(i) Such notice to the adoptive parents shall set forth that unless, within ten days from the date of such notice the court shall receive from the adoptive parents notice, in writing, of their intention to oppose such revocation by the parents, the adoption proceeding will be dismissed and that, in case of such dismissal, the court will send to the parents and to the adoptive parents the notice of dismissal, as provided in paragraph (c) of this subdivision.

"(ii) Such notice to the adoptive parents shall further set forth that if, within ten days from the date of such notice, the court shall receive from the adoptive parents notice, in writing, of their intention to oppose such revocation by the parents, the court will, upon notice to the parents and to the adoptive parents, proceed, as provided in paragraph (d) of this subdivision, to a determination of whether such notice of revocation by the parents shall be given force and effect and to a determination of what disposition shall be made of the custody of the child.

"(c) If the adoption proceeding is dismissed pursuant to the provisions of paragraph (b) of this subdivision,

"(i) Written notice of such dismissal shall forthwith be sent to the parent or, if represented by attorney, to the attorney for the parent, and to the attorney for the adoptive parents.

"(ii) Such notice of dismissal shall set forth the name and address of the parent, the name and address of the attorney

for the parent, if any, the name and address of the attorney for the adoptive parents.

"(iii) Such notice of dismissal shall further set forth that if the child is not returned to the custody of the parent within ten days from the date of such notice of dismissal, the court will forthwith upon request, in writing, by the parent or by the attorney for the parent, furnish to said parent or attorney so requesting, the names and addresses of the adoptive parents.

"(iv) Such notice of dismissal shall further state that, in the event the custody of the child is not returned to the parent by the adoptive parents upon request therefor, a proceeding to obtain custody may be instituted by the parent in the Supreme Court or the Family Court,

"(d) If, pursuant to the provisions of paragraph (b) of this subdivision, the adoptive parents shall give notice of their intention to oppose the revocation of the parent's consent,

"(i) The court shall promptly notify, in writing, the parent or the attorney for the parent, if any shall have been named in the notice of revocation, and the attorney for the adoptive parents, that the court will, upon the date specified in such notice by the court, or as soon thereafter as the parties may be heard pursuant to this paragraph, hear and determine whether revocation of the consent of the parent shall be permitted and, in any event, hear and determine what disposition should be made with respect to the custody of the child.

"(ii) The court shall, upon the date specified, take proof as to whether the best interests of the child will be promoted by the return of the child to the parents, or by the adoption of the child by the adoptive parents, or by placement of the child with an authorized agency for foster care with or without authority to consent to the adoption of the child, or by other disposition of the custody of the child.

"(iii) If the court shall determine that the best interests of the child will be served by returning custody of the child to the parent or by placement of the child with an authorized agency or by disposition other than adoption by the adoptive parents, the revocation of consent shall be given force and effect and the court shall make such disposition

of the custody of the child as will best serve the interests of the child.

"(iv) If the court shall determine that the best interests of the child will be served by adoption of the child by the adoptive parents, the court shall enter an order denying any force or effect to the notice of revocation of consent and shall dispose of the custody of the child as if no such notice of revocation had been given by the parent.

"(v) In such proceeding the parent or parents who consented to such adoption shall have no right to the custody of the child superior to that of the adoptive parents, notwithstanding that the parent or parents who consented to the adoption are fit, competent and able to duly maintain, support and educate the child. The custody of such child shall be awarded solely on the basis of the best interests of the child, and there shall be no presumption that such interests will be promoted by any particular custodial disposition.

"4. Nothing contained in this section shall limit or affect the power and authority of the court in an adoption proceeding, pursuant to the provisions of section one hundred sixteen of this title, to remove the child from the home of the adoptive parents, upon the ground that the welfare of the child requires such action, and thereupon to return the child to a natural parent or place the child with an authorized agency, or, in the case of a surrogate, transfer the child to the family court; nor shall this section bar actions or proceedings brought on the ground of fraud, duress or coercion in the execution or inducement of an adoption consent".

The statute allows for two types of consent. The first is a judicial consent, which becomes absolutely irrevocable when "executed or acknowledged before a judge or surrogate of the court in which the adoption proceeding is to be commenced" (Domestic Relations Law, § 115-b, subd 1, par [c]). To insure that the natural parent knows that the judicial consent is irrevocable, the Judge or Surrogate who takes the consent must first "inform such person of the consequences of such act" (Domestic Relations Law, § 115-b, subd 2), and the consent form itself must recite that the

parent's consent "shall become irrevocable upon such execution or acknowledgement" (Domestic Relations Law, § 115-b, subd 1, par [c]).

The second type of consent is extrajudicial. It is not absolutely irrevocable upon its execution, but becomes irrevocable 30 days after the commencement of the adoption proceeding, if, within that period, the natural parent does not withdraw his or her consent (Domestic Relations Law, § 115-b, subd 1, par [d], cl [i]). If there is a timely and proper revocation of consent, the adoptive parents are so informed (Domestic Relations Law, § 115-b, subd 3, par [b]). If the adoptive parents do not oppose the revocation, the adoption petition will be dismissed and the child returned to the natural parent (Domestic Relations Law, § 115-b, subd 3, par [b], cl [i]; par [c]). If the adoptive parents oppose the revocation, the court shall conduct a hearing to "determine whether revocation of the consent of the parent shall be permitted and, in any event, hear and determine what disposition should be made with respect to the custody of the child", based on an evaluation of what would be in "the best interests of the child" (Domestic Relations Law, § 115-b, subd 3, par [d], cls [i], [ii]). At the hearing, the natural parent will not benefit from any presumption in his or her favor, nor will it be necessary to show that the natural parent is unfit before the child can be adopted (Domestic Relations Law, § 115-b, subd 3, par [d], cl [v]). In short, both the natural and adoptive parents will stand on the same footing.

The primary question before us, as made clear in appellant's brief, is: what does the statute mandate with regard to an extrajudicial consent so as to insure that the natural parent is apprised of her or his rights? The majority argues that section 115-b does not mandate a warning about the best interests determination. The natural mother contends that this, along with other information pertinent to the schema applicable to an extrajudicial consent, is required by the statute to be part of the consent. I agree with her to the extent that I conclude that a consent form, to be valid under the statute, must have language in it informing the signatory that if she or he timely revokes the consent, and if the adoptive parents still want the child, the child will

not be returned to the natural parent unless the court first determines that such would be in the child's best interests.

I am led to the above conclusion by several considerations. First, the very organization of section 115-b is significant. Subdivision 1 sets forth the requirements of a valid private placement consent. Subdivision 2 provides that a Surrogate or Judge who takes a consent must explain to the natural parent what will happen when the consent is signed. The third subdivision is concerned with extrajudicial consents. It presupposes that the initial consent is valid and considers how a consent is revoked, and what happens thereafter. Subdivision 4 pertains to circumstances which are not relevant to this case. The last clause of subdivision 1 (par [d], cl [ii]) states: "Notwithstanding that such written notice shall have been received within said thirty days, the notice of revocation shall be given effect only if the adoptive parents fail to oppose such revocation, as provided in subdivision three of this section, or, if they oppose such revocation and the court as provided in subdivision three of this section shall have determined that the best interests of the child will be promoted by giving force and effect to such revocation". I submit that this clause would not have been inserted in the statute unless the Legislature intended it to be incorporated into the language of a valid consent. The information contained in this clause is redundant to that found in subdivision 3. I can perceive of no reason for this clause to be in the statute except in reference to what should be contained in a consent to make it valid. The fact that the clause is inserted in subdivision 1, the subdivision pertaining to the making of a consent, confirms this conclusion.

Secondly, the initial phrase of subdivision 1 states: "If a duly executed and acknowledged consent to a private-placement adoption shall so recite". I take this to mean everything that follows in subdivision 1 is to be reflected in the consent in order to make it valid under the statute, including the above-quoted clause of subdivision 1 (par [d], cl [ii]).

The majority, in interpreting the statute, argues that the presence of the phrase "if it [the consent] shall so state" in subdivision 1 (par [d], cl [i]), and its absence in clause (ii) of

the same paragraph, demonstrates conclusively that clause (ii) need not be contained in the consent. My colleagues maintain that their conclusion is manifested by the unambiguous language of the statute, and that, since the meaning and intent of the statute is clear, it is inappropriate to resort to rules of construction in order to apply the statute. Citation is made to cases such as *New Amsterdam Cas. Co. v Stecker* (3 NY2d 1).

There is an inconsistency in my colleagues' argument, in that, to arrive at their conclusion, they themselves resort to a rule of construction. That rule is *expressio unius est exclusio alterius*, i.e., the expression of a thing or act in one place implies that its omission elsewhere was intentional (McKinney's Cons Laws of NY, Book 1, Statutes, § 240). One is reminded here of the following comment made by Judge JASEN, writing for the majority of the Court of Appeals in the case of *Williams v Williams* (23 NY2d 592, 598): "It has sometimes been said that if the words of a statute are clear on their face the statute must be administered on the basis of those words, and that only statutes of doubtful meaning are subject to judicial interpretation. However, this rule of construction suffers from the basic fallacy that words have meaning in and of themselves. A statute is 'clear and unambiguous' because the court has considered the meaning of the statute and reached a conclusion on the question of legislative intention". Sutherland's classical treatise on statutory interpretation in even stronger language exposes the irony implicit in the proposition that a "clear and unambiguous" statute should not be subject to judicial interpretation. "The assertion in a judicial opinion that a statute needs no interpretation because it is 'clear and unambiguous' is in reality evidence that the court has already considered and construed the act. It may also signify that the court is unwilling to consider matter or evidence bearing on the question as to how the statute should be construed, and is instead declaring its effect on the basis of the judge's own uninstructed and unrationalized impression of its meaning. Because issues as to what a statute means or what a legislature intended are essentially issues of fact, even though they are decided by the judge and not by a jury, a court should

never exclude relevant and probative evidence from consideration". (2A Sutherland, Statutes and Statutory Construction [4th ed], § 45.02, p 4.)

The inconsistency in the majority's argument aside, my colleagues can hardly quarrel with the proposition that, in interpreting a statute, legislative intent is the great and controlling principle and that, in determining such intent, provisions of an act will not be analyzed in isolation but rather with reference to the whole statutory scheme and in context (*Matter of Petterson v Daystrom Corp.,* 17 NY2d 32, 38-39; *Matter of Meyer,* 209 NY 386; *People ex rel. Onondaga County Sav. Bank v Butler,* 147 NY 164, 167-168). I have already discussed two aspects of the statute which support my contention that the consent form should inform the natural parent that a revocation of consent may be subject to judicial review under a best interests standard, viz., the organization of the statute and the explicit command contained in the initial phrase of subdivision 1. A third consideration is equal treatment for those involved in the adoption process, and a comparison of various parts of section 115-b.

A natural parent who executes a consent in front of a Judge or Surrogate must be informed by the latter as to the consequences of what she or he is doing. Thus, the statute insures that the judicial consent is a knowledgeable one. In the case of an extrajudicial consent, there is no way to insure that the natural parent will be fully aware of the legal consequences of the consent. After all, a Judge or Surrogate, by definition, is not present to make sure that the parent is truly aware of what is happening. In such a situation, the consent form itself must provide the necessary information. I do not believe that the Legislature would be so sensitive to the need to inform a parent who signs a judicial consent, but would ignore the equally vital need to make certain that a signer of an extrajudicial consent has, at least, the basic legal facts before him or her. In the words of Chief Judge (then Judge) FULD, speaking for a unanimous Court of Appeals faced with a similar apparent discrepancy in a statute: "Manifestly, to differentiate between the two situations would not only be completely illogical and unrealistic but would, indeed, serve to

thwart the very policy considerations underlying the statute. Absent clear language to that effect * * * we will not ascribe such ambivalent intentions to the Legislature" (*Matter of Hogan v Culkin,* 18 NY2d 330, 335).

It is also noteworthy that, under subdivision 3 of section 115-b, when a natural parent files a revocation, the court must inform the adoptive parents of the situation. The notice to the adoptive parents must state that if the latter choose to oppose the revocation, "the court will * * * proceed, as provided in paragraph (d) of this subdivision [concerning a best interests hearing], to a determination of whether such notice of revocation by the parents shall be given force and effect and to a determination of what disposition shall be made of the custody of the child" (Domestic Relations Law, § 115-b, subd 3, par [b], cl [ii]). It would be remarkable for the Legislature to require such a detailing of information for the benefit of the adoptive parents, to aid them in their decision as to whether or not to oppose the revocation, without requiring that similar information be given to the natural parent, to aid in the initial decision of whether to place the child for adoption. I submit that the Legislature has not so neglected the natural parent and that subdivision 1 (par [d], cl [ii]) is intended for this very purpose. It is only with this view of the statute that we do not violate the rule that "[a]ny statute or regulation, but particularly social legislation, however broad, must be interpreted and enforced in a reasonable and humane manner in accordance with its manifest intent and purpose" (*Matter of Sabot v Lavine,* 42 NY2d 1068, 1069). The statute, as a whole, manifests the Legislature's purpose of insuring that the decision of both the adoptive and natural parents should be made with clarity, understanding and certainty. A too restrictive construction of the statute defeats this purpose and results in inconsistency and works an injustice to the natural parent (see *Williams v Williams,* 23 NY2d 592, *supra; Matter of Meyer,* 209 NY 386, *supra; People ex rel. Onondaga County Sav. Bank v Butler,* 147 NY 164, *supra*).

My colleagues strenuously oppose the use of the legislative history of section 115-b as an aid in this exercise in statutory interpretation, again on the alleged grounds that

the statutory language is unambiguous. In point of fact, section 115-b is not free from ambiguity. At the very least, the statute does not expressly state that the consent need not inform the natural parent of the prospect of a best interests determination. Furthermore, the discussion so far amply supports the conclusion that when the statute is read in context, as must be done, it may reasonably be inferred that the consent form should contain such a warning (*New York State Bankers Assn. v Albright,* 38 NY2d 430, 437). Under such circumstances, it certainly is appropriate to examine the statute's legislative history (*Matter of Harbolic v Berger,* 43 NY2d 102, 107).

Nonetheless, I do not agree that the absence of facial ambiguity precludes a search of a statute's history. Chief Judge BREITEL, speaking for a unanimous court, had this to say when faced with a similar argument: "It has been said often, but with less than meticulous analysis, that an 'unambiguous' statute permits of no inquiry into legislative intention (see, e.g., *McCluskey v Cromwell,* 11 NY 593, 601; accord, e.g., *Matter of Roosevelt Raceway v Monaghan,* 9 NY2d 293, 304, app dsmd 368 US 12; see, generally, McKinney's Cons Laws of NY, Book 1, Statutes, § 120). Absence of facial ambiguity is, however, rarely, if ever, conclusive. The words men use are never absolutely certain in meaning; the limitations of finite men and the even greater limitations of his language see to that. Inquiry into the meaning of statutes is never foreclosed at the threshold; what happens is that often the inquiry into intention results in the conclusion that either there is no ambiguity in the statute, or that for policy or other reasons the prior history will be rejected in favor of the purportedly explicit statement of the statute (see, e.g., *Matter of Barton v Lavine,* 38 NY2d 785). Then it is often said with more pious solemnity than accuracy, that the clarity of the statute precludes inquiry into the antecedent legislative history. As the Supreme Court stated in *United States v American Trucking Assns.* (310 US 534, 543-544): 'There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legisla-

tion. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination". The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said. Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion.' (See, e.g., *Le Drugstore Etats Unis v New York State Bd. of Pharmacy,* 33 NY2d 298, 302; *Matter of Astman v Kelly,* 2 NY2d 567, 572; McKinney's Cons Laws of NY, Book 1, Statutes, § 111; 82 CJS, Statutes, § 322, at pp 588-590.)" (*New York State Bankers Assn. v Albright,* 38 NY2d 430, 436-437, *supra.*) As the Supreme Court has stated, "words are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how 'clear the words may appear on "superficial examination" ' " (*Harrison v Northern Trust Co.,* 317 US 476, 479, quoting from *United States v American Trucking Assns.,* 310 US 534, 544; accord *Uniformed Firefighters Assn. v Beekman,* 52 NY2d 463, 471).

As already indicated, the majority reaches its interpretation of the statute by employing the rule of construction *expressio unius est exclusio alterius.* While this rule is certainly useful, it may, nonetheless, be misapplied. In this

case, the statute's history demonstrates that relying exclusively on this one rule of construction in order to understand the statute is overly simplistic (*Rankin v Shanker*, 23 NY2d 111, 115).

The legislative history of section 115-b adds a significant dimension to understanding the statute's meaning and represents the fourth consideration in my analysis. As noted by the majority, it was enacted (L 1972, ch 639, § 3) in response to *People ex rel. Scarpetta v Spence-Chapin Adoption Serv.* (28 NY2d 185), and similar cases (see memorandum of Assemblyman Pisani, NY Legis Ann, 1972, pp 202-203). In *Scarpetta* (*supra*), the Court of Appeals interpreted our adoption statutes as they then read, holding that a parent who consented to an adoption could apply to a court to have the child returned, provided that the adoption had not already become final or certain other requirements had not been met. The Court of Appeals held that a court considering such an application by the natural parent should return the child "unless it is clearly established that she [the natural parent] is unfit to assume the duties and privileges of parenthood" (*People ex rel. Scarpetta v Spence-Chapin Adoption Serv., supra,* p 194).

A "memorandum in support" of the then proposed section 115-b, which was sent by Assemblyman Pisani to the Governor's counsel and is contained in the bill jacket to chapter 639 of the Laws of 1972, pointed out that, while under *Scarpetta* (*supra*), the natural parent would regain the child absent a showing that he or she is unfit, under the proposed section 115-b of the Domestic Relations Law the child would only be returned if such was in the best interests of the child, with no presumption favoring the natural parent. Assemblyman Pisani went on in his memorandum to note (p 4): "The Court of Appeals, in Scarpetta (DeMartino), stated that the holding was based upon its interpretation of the present law relating to adoptions. It explicitly recognized that the law could be changed to fix the period within which the mother could revoke her relinquishment. This the bill does, by specifying a reasonable period within which the natural mother must revoke her surrender or consent; *assuring that she will be fully*

*informed as to the consequences of her action and of her right of revocation"* (emphasis supplied).

Assemblyman Pisani, who was the primary sponsor of the Assembly's version of the bill, also stated the following in another memorandum (NY Legis Ann, 1972, pp 202-203):

"The bill also adds a new section 115-b to the domestic relations law to provide the mechanism for a 30 day irrevocability period beyond which the natural mother will not be able to change her mind and demand the child back. As soon as the consent is executed by the natural parent and the custody of the child is transferred to the prospective adoptive parents, the attorney for the adoptive [sic] parents is expected to file the adoptive papers with the court. Thereupon the 30 day period begins to run. *The natural mother has been provided with a copy of the consent containing pertinent information including the name and address of the court where the proceeding will be heard and a written description of her rights.* If she files a written revocation within 30 days with the court the bill provides the proper and fair mechanism for return of the child.

"The purpose of this bill is to provide stronger guarantees of the permanence of child adoption arrangements involving authorized social agencies and private-placement adoptions. *This legislation is intended to provide a legal framework within which future adoptions can be undertaken with reasonable guarantees of permanence and with humane regard for the rights of the child, the natural mother and the adoptive parents. This bill attempts to meet these specifications by unmistakably setting forth the rights of the parties involved.*

"The uncertainty under which the adoptive parents are now required to live cannot but adversely affect the relationship between them and the child during the period prior to the actual adoption. The present structure of the law subjects the natural mother, until the adoption is completed, with the heavy emotional burden of constantly reconsidering whether she has taken the proper step as far as the child is concerned. *This bill, therefore, provides adequate safeguards to the natural mother against an improvident decision by her to give up the child for adoption.*

"The recent cases involving the DeMartinos, the Bacilles and the McAlpines have demonstrated very amply that the present law is inadequate and until the law is clarified, future cases such as these will continue to occur. *This bill is designed to correct the weakness of the law and introduce certainty in an area where certainty is required when dealing with the strongest of all human feelings — the relationship of mother and child*" (emphasis supplied).

The above-quoted statements by the chief sponsor of section 115-b indicate that the statute was intended not only for the benefit of the adoptive parents and the child, but also to protect the natural parent. As noted by the Surrogate's Court in this case, the consent signed by appellant is deceiving, since it suggests that a timely revocation would, in and of itself, be enough to restore the child to the natural parent. Such a state of affairs does not, in the words of the bill's sponsor, provide "adequate safeguards to the natural mother", nor does it promote "certainty in an area where certainty is required". On the other hand, if clause (ii) of paragraph (d) of subdivision 1 were included in the consent form, the natural parent would be put on notice that a best interests finding by the court might be necessary before the child was returned. With such a warning, a parent may well decide not to sign the consent, whereas, without the warning, she might sign the consent, believing that she could always change her mind and get her child back.

The fifth and final factor that I consider relevant in this statutory interpretation involves the constitutionality of the consent form. It is axiomatic that a statute will be interpreted, if possible, so as to preserve its validity in the face of an allegation of unconstitutionality. In my opinion, the majority's interpretation of what the statute requires and does not require to be placed in the form leaves the statute in violation of due process. As a result, even if section 115-b could possibly be read so as not to require that a valid consent to adoption inform the natural parent that a revocation of consent may be subject to a best interests determination, "we would be privileged, nay obliged, to reject such a construction" (*Matter of Second Report of Nov., 1968 Grand Jury,* 26 NY2d 200, 205).

It should be noted that, at this juncture, it is unnecessary to address the majority's argument with respect to standing. What should be contained in the form under constitutional due process standards is relevant, at this point, on the issue of statutory interpretation. Whether the natural mother in this case has standing to complain that the form does not comport with the statute's requirements will be discussed *infra.*

A due process analysis proceeds through a two-part inquiry: whether there has been a deprivation of a protected liberty or property interest, and if so, what process is due (see *Logan v Zimmerman Brush Co.,* 455 US 422, 428). There can be no doubt that parental rights are a constitutionally protected interest since the Supreme Court has consistently recognized that freedom of choice in matters of family life is a fundamental liberty interest (see *Santosky v Kramer,* 455 US 745, 753, and cases cited therein). Our State courts have also recognized that the interest of the natural parent in remaining the legal parent of his or her child is of constitutional magnitude (see *Matter of Leon RR.,* 48 NY2d 117). Thus, it has been held that "a court may not terminate all parental rights by offering a child for adoption where there has been no parental consent, abandonment, neglect or proven unfitness, even though some might find adoption to be in the child's best interests (*Matter of Corey L v Martin L,* 45 NY2d 383)" (*Matter of Sanjivini K.,* 47 NY2d 374, 382; see, also, *Matter of Ricky Ralph M.,* 56 NY2d 77). A natural parent's "desire for and right to 'the companionship, care, custody, and management of his or her children' " is an interest far more precious than any property right (*Lassiter v Department of Social Servs.,* 452 US 18, 27, quoting from *Stanley v Illinois,* 405 US 645, 651). It follows that when the State establishes a mechanism to terminate familial bonds, it must provide the parents with fundamentally fair procedures (*Santosky v Kramer,* 455 US 745, *supra*).

Due process requires, at a minimum, "that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case" (*Mullane v Central Hanover Trust Co.,* 339 US 306, 313). However, the due process rights to notice and

a hearing prior to a civil judgment are subject to waiver (*Fuentes v Shevin,* 407 US 67, 94-95; *Overmyer Co. v Frick Co.,* 405 US 174, 185). Where there is a waiver of adjudication, the functional equivalent of notice is the presentation of information to the waiving party (Rubin, Toward a General Theory of Waiver, 28 UCLA L Rev 478, 539; Note, Fairness, Flexibility, and the Waiver of Remedial Rights by Contract, 87 Yale L J 1057, 1074-1077). In the extrajudicial adoption context, the consent form, which operates as a waiver of parental rights, undertakes the notice function since it is the only statutorily guaranteed source of information for the natural parent. Generally, notice given prior to a hearing must clarify the basis for the government's proposed action in order to give the party a chance to defend himself (see *Wolff v McDonnell,* 418 US 539; *Goldberg v Kelly,* 397 US 254). But, in a waiver setting, where there is no opportunity for a hearing or defense on the merits, the purported waiver document must inform the party of the legal consequences of the waiver so that an intelligent decision can be reached (see *Fuentes v Shevin,* 407 US 67, 95, *supra; Stone v Maher,* 527 F Supp 10, 17; *County of Ventura v Castro,* 93 Cal App 3d 462, cert den 444 US 1098). If a consensual adoption proceeding is to afford a natural parent due process of law, the consent must be sufficient in form to warrant the relinquishment of parental rights (see *Matter of Andersen,* 99 Idaho 805).

"A waiver is 'the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it' " (*Werking v Amity Estates,* 2 NY2d 43, 52, quoting from Whitney, Contracts [4th ed], p 273). Where personal liberty is involved, as in the criminal context, it is generally held that a waiver of due process rights must be voluntarily, knowingly, and intelligently made (see, e.g., *Brady v United States,* 397 US 742, 748; *Miranda v Arizona,* 384 US 436, 444; see, also, *Johnson v Zerbst,* 304 US 458, 464). The standard for relinquishment of parental rights, also a fundamental liberty interest, has been held to be governed by the same standard (see *Matter of T.W.C.,* 38 NY2d 128; *Matter of Infant S. [Tretin],* 48 AD2d 425, 426). Since the consent to adoption constitutes the relinquishment of parental rights, it must be executed with full

awareness of the legal consequences (*Matter of Andersen,* 99 Idaho 805, 815, *supra*). Moreover, in recognition of the State's significant interest in the protection of children in its *parens patriae* role, an adoption predicated solely upon the natural parent's consent requires strict scrutiny of the circumstances of the execution of the consent (see *Matter of Vaida,* 34 Ore App 631).

The consent, by reason of its notice function, should be tailored to the capacities and circumstances of the intended recipients (see *Goldberg v Kelly,* 397 US 254, 268-269, *supra*). The instant class of consenting parents undoubtedly encompasses various levels of education, experience and resources and it is obvious that in most circumstances the members of the class are young, likely unwed and of uncertain financial resources (see *Memphis Light, Gas & Water Div. v Craft,* 436 US 1, 14, n 15). In the circumstances in which they find themselves, many members of this class may not consult an attorney (see *Finberg v Sullivan,* 634 F2d 50, 62; *Deary v Guardian Loan Co.,* 534 F Supp 1178, 1187), and thus the notice and waiver functions of the consent form must be tailored to the realities of the prospective signers.

Consents to adoption "are almost always executed under circumstances which may cast doubt upon their voluntariness or on understanding of the consequences of their execution" since the consent is likely to involve an impulsive, emotional or unreasoned decision (*People ex rel. Scarpetta v Spence-Chapin Adoption Serv.,* 28 NY2d 185, 191, *supra;* Attorney-General's memorandum for the Governor, bill jacket, L 1972, ch 639). Unlike agency placements where it is the responsibility and duty of the agency to counsel the mother (see Foster, Revocation of Consent to Adoption: A Covenant Running with the Child?, NYLJ, Aug. 6, 1971, p 1, col 4; Note, The Adoption Dilemma: The Divergence of Theory and Practice, 38 Brooklyn L Rev 772, 776), a private placement adoption may be undertaken by unlicensed groups or individuals with no concern for the natural parent (see Comment, Independent Adoption: Is the Black and White Beginning to Appear in the Controversy Over Gray-Market Adoptions? 18 Duquesne L Rev 629). Services and counseling for the natural mother are

often neglected with private placement adoptions (see Survey of New Jersey Adoption Law, 16 Rutgers L Rev 379, 403-405), and there is generally a higher revocation rate than with agency placements (see Eckstein, Adoption Reform: A Proposal, 10 New England L Rev 371, 376).

Given the above circumstances, I conclude that the extrajudicial consent form used in this case is deceptive since it conveys to the lay person the impression that it can be wholly extinguished within 30 days of the initiation of the adoption proceeding and that no untoward consequences will flow from it if revocation is timely. The impression thus conveyed is a strong and unfair inducement to the procurement of consents to adoption. The form actually undermines the knowing and voluntary nature of the consent (see *Matter of Andersen,* 99 Idaho 805, *supra*). Of particular significance is the fact that, as already noted, constitutional principles and our basic societal mores generally allow a natural parent to remain the legal parent even if he/she is not the best parent possible, or even available, and that he or she will continue to fill this role even if it might be said that the child's best interests would otherwise be served (see *Matter of Ricky Ralph M.,* 56 NY2d 77, *supra*). Section 115-b of the Domestic Relations Law provides a mechanism whereby a natural parent who revokes his or her consent, nonetheless, may not obtain the return of the child, despite being a fit parent, if a court considers such not to be in the best interests of the child. While the constitutionality of this provision in the statute is not raised on appeal, the question of the adequacy of the notice of consent is before us. I submit that a written consent to an adoption must, because of the sacrifice of very important constitutional rights, inform the signer that the return of the child upon revocation of consent will be contingent on what the court determines to be in the best interests of the child.

What process is due anyone turns on a balancing of three factors: the private interests affected by the proceeding, the risk of error created by the State's chosen procedure, and the countervailing governmental interest supporting use of the challenged procedure (*Mathews v Eldridge,* 424 US 319, 335). The first two factors have already been

reviewed: the private interest of a natural parent is commanding, and the risk of error that an involuntary or unintelligently given consent would be induced is substantial (cf. *Santosky v Kramer,* 455 US 745, 758-760, *supra*). As for the governmental interests at stake, it is, of course, true that the State has a significant interest in the welfare of children and the stability of the adoption process. In this respect, the State has no legitimate interest in procuring consents from parents who have not been informed of the consequences of their acts. On the contrary, any measure that strengthens the legal awareness of the natural parent can only increase the stability of the process by reducing the number of attempted revocations (Note, Adoption Reform in Ohio, 24 Cleveland State L Rev 146, 166). Thus, more rigorous notice requirements concerning the legal consequences of execution are not only consistent with the State's interest but will further the underlying aims of the adoption scheme. As presently structured, the extrajudicial consent is not reasonably calculated to convey the requisite information and is fundamentally unfair, without significant countervailing State or private interests to warrant its continued use (see *Stone v Maher,* 527 F Supp 10, *supra*).

In sum, I conclude that the present extrajudicial consent form violates the due process rights of the natural parent by failing to inform her or him that if consent is revoked, as allowed by the statute, the child will not necessarily be returned to the parent but will be subject to a judicial determination of custody, based on a best interests scrutiny. Whether due process requires additional warnings to be placed in the form need not be resolved here. It is sufficient to note that the form violates due process in the manner already indicated, and that, therefore, if possible, section 115-b should be interpreted so that the unconstitutional taint of the form will not be visited on the statute. This is easily achieved if the statute is read, as I read it, as requiring the contents of subdivision 1 (par [d], cl [ii]) to be placed into a valid consent.

Once it is seen that section 115-b requires that an extrajudicial consent inform the natural parent that a timely revocation of consent will not be effective unless the

adoptive parents fail to oppose the revocation, or if they oppose such revocation, the court determines, following the procedures of subdivision 3 of the statutes, that the best interests of the child will be promoted by giving effect to the revocation, the disposition of this appeal becomes clear. Adoption was unknown to the common law, and exists only by statute (*Matter of Malpica-Orsini,* 36 NY2d 568, 570). No person may be adopted except pursuant to the procedures and conditions established by the Legislature (*Matter of Malpica-Orsini, supra,* p 570; *Matter of Eaton,* 305 NY 162, 165; *Matter of Adult Anonymous II,* 88 AD2d 30). This follows from the fact that a strict interpretation is required because the adoption statutes are in derogation of the common law. More important, it follows from the fact that constitutional rights of parentage are involved (*Matter of Ricky Ralph M.,* 56 NY2d 77, 81, *supra*) and that "the delicate and definitive nature of the adoption proceeding, which fundamentally touches and radically alters the lives of all concerned", demands a "[p]recise and exacting compliance with the procedures mandated" by statute (*Dennis T. v Joseph C.,* 82 AD2d 125, 129). This court, in *Dennis T. v Joseph C. (supra)*, in an opinion by Justice MANGANO, recently held that the principle of strict compliance with adoption statutes applies to the two types of consents allowed for under section 115-b. Where a purported consent to adoption does "not conform to either of the two statutorily prescribed methods for effecting an irrevocable consent to adoption * * * [t]he natural mother * * * [retains] the right unilaterally to revoke her consent" (*Dennis T. v Joseph C., supra,* p 132; see, also, *Matter of Male M.,* 76 AD2d 839, *supra*). In this case, the purported consent was not a judicial one, and since, as an extrajudicial consent, it did not contain the information required by subdivision 1 (par [d], cl [ii]) of the statute, it did not conform to the requirements of the statute. It must, therefore, be considered ineffective, and appellant had the right, without limitation, to revoke her consent to the adoption within 30 days of commencement of the adoption proceeding.

The majority's argument with respect to standing is not apropos to this case. As already indicated, the constitutionality of section 115-b is not at stake; thus, case law pertaining to the standing of a person to challenge a statute on

constitutional grounds is inapposite. Furthermore, neither in Surrogate's Court nor on appeal to this court have the adoptive parents raised a question of standing. Therefore, they must be deemed to have waived any objection to the natural mother's standing (see *Matter of Prudco Realty Corp. v Palermo,* 60 NY2d 656).

An even more fundamental error is made, however, by the majority's confusion of the concept of actual or threatened injury, which is necessary to establish standing, with that of prejudice. Assuming, for the sake of argument, that appellant was independently aware when she signed the consent that a revocation might not be effective and that a best interests determination might first have to be made, a conclusion with which I by no means agree, that does not mean that she lacks standing to challenge the sufficiency of the consent form. Her standing is established by the simple fact that the Legislature has set forth in section 115-b certain conditions which must be met to make a private placement consent valid, and the consent that appellant signed did not satisfy some of these conditions (see *Warth v Seldin,* 422 US 490, 500). What appellant knew or did not know is not pertinent to the question of whether the form complied with the statute or of whether she can claim that it is thereby invalid. Under the common law, a parent could never just give away his or her child in the sense of cutting off the status of legal parentage. By statute this can now be done, but only, as made clear in *Dennis T. v Joseph C.* (82 AD2d 125, *supra*) and the other cases discussed above, if the procedures and conditions established by statute are scrupulously honored. A "bright-line" rule exists. Compliance therewith is mandatory, irrespective of lack of prejudice to the natural parent.

Strict compliance with the prescriptions of statute or the Federal and State Constitutions is scarcely something new in the law. For example, both due process and statute (e.g., CPLR 308) require service of process to be made in a certain manner. A party not properly served has every right to contest service and jurisdiction, irrespective of the question of whether the summons was, in fact, received (*McDonald v Ames Supply Co.,* 22 NY2d 111, 114-115). Another example of a "bright-line" rule, and perhaps the

most famous one, is the requirement, based on the Fifth Amendment (US Const, 5th Amdt), that police officers give a person the *Miranda* rights (*Miranda v Arizona,* 384 US 436, *supra*) before subjecting him to custodial interrogation. If these rights are not given, or if they are incorrectly given, subsequent admissions will be inadmissible on the People's case against that person, irrespective of whether or not he, in fact, independently knew his rights (*Miranda v Arizona, supra,* pp 467-469). A third example was recently considered by this court and involves a series of wiretap warrants (*People v Gallina,* 95 AD2d 336). In that case, there was a six-day period of time in which the tap was in effect without a warrant. The original warrant was obtained on July 13, 1981, and was extended on August 10 to continue until September 9. However, it was not until September 15 that an application for a further extension was made and granted. Because the statutory requirements concerning eavesdropping (CPL art 700) must be strictly construed, the court, in an opinion by Justice TITONE, held that any conversation occurring after September 9 had to be suppressed, "irrespective of lack of prejudice to the defendant or good faith of the investigation" (*People v Gallina, supra,* p 343). For similar reasons, a purported lack of prejudice to appellant, arising from what constitutes a substantive defect in the form, is irrelevant. The right to be the parent of one's own offspring is at stake here. That right is as fundamental as any in our hierarchy of values and is protected by constitutional and statutory law. It cannot be abridged except by the most exacting compliance with proper procedure, which was lacking in this case.

The conclusion that appellant's knowledge of her rights at the time that she signed the consent, arrived at independently of the information contained in the form, is irrelevant to her standing to challenge the consent form, is supported by another consideration. The Supreme Court has noted that "[w]e need not concern ourselves with the involuntariness or unintelligence of a waiver when the contractual language relied upon does not, on its face, even amount to a waiver" (*Fuentes v Shevin,* 407 US 67, 95, *supra*). The plaintiff in *Fuentes* (*supra*), purchased a gas

stove and a stereo under a conditional sales contract. The contract stated in part that " 'in the event of default of any payment or payments, Seller at its option may take back the merchandise' " (*Fuentes v Shevin, supra,* p 94). As it turned out, the seller seized the property, using a writ of replevin. The Supreme Court held that the State replevin statute involved violated due process because it allowed for a deprivation of property without affording an opportunity for the possessor to be heard. The court addressed itself to the contention raised by the seller that by signing the contract, which contained the above-quoted provision allowing the seller to take the merchandise on default, the buyer had waived his procedural due process rights. The Supreme Court stated that it did not have to decide whether there had been a voluntary and intelligent waiver for the simple reason that the contract did not indicate that the buyer waived his or her right to a hearing. It only stated that the seller could recover the goods, without saying how.

In the case at bar, respondents, the adoptive parents, would have us hold that by signing the consent form, appellant voluntarily placed herself in a position whereby, if she timely revoked her consent and respondents opposed the revocation, the adoption proceeding would be determined by what would be in the child's best interests, sans consideration of appellant being the natural parent. The respondents contend that a signature on the form is, in effect, a waiver of the natural parent's right, a right which is protected by constitutional principles (see *Matter of Sanjivini K.,* 47 NY2d 374, *supra*) to be the legal parent absent a finding of unfitness as set forth in section 384-b of the Social Services Law (see *Matter of Ricky Ralph M.,* 56 NY2d 77, *supra*). The short answer to their contention is that the form appellant signed does not contain such a waiver. In fact, it suggests just the opposite. As noted by the trial court, the form, at least, implies that upon a timely revocation of consent, the child will be promptly returned to the parent and the adoption proceeding will be dismissed.

It hardly needs to be said that appellant's interest in her child is far more important, in every respect, than the

property interest of Mrs. Fuentes in her stove and stereo. It would be a travesty of justice and an absurdity to require waivers of substantial due process rights to be clear when property is involved (*Fuentes v Shevin, supra,* p 95), but then to condone and uphold a so-called waiver which is as obscure and as fuzzy as the one here, when parental rights are involved.

The bottom line is that appellant signed an invalid consent. Therefore, at least in the circumstances of this case, when appellant filed a revocation within 30 days of the initiation of the adoption proceeding, the petition of the adoptive parents should have been dismissed (*Dennis T. v Joseph C.,* 82 AD2d 125, *supra; Matter of Male M.,* 76 AD2d 839, *supra*). Since there is nothing in the record which would suggest that appellant is or would be an unfit mother, the child should immediately be returned to her custody (*Dennis T. v Joseph C., supra,* pp 132-134).

The principal themes of this dissent are that the consent form signed by appellant was in violation of both statutory and constitutional law and that what appellant actually knew concerning her rights, independent of the form, is immaterial to whether she has standing to address the adequacy of the form. While these conclusions have been aptly demonstrated to be true by the foregoing discussion, for the sake of completeness it is worthwhile to consider this appeal assuming, *arguendo,* that whether she was actually aware of the content of the provisions of section 115-b is an important factor in determining whether she has standing to challenge the form.

According to my colleagues in the majority, appellant's trial attorney, Mr. Papantonio, made a formal judicial admission to the effect that appellant was not misled by the consent form. Therefore, it is concluded that "she has suffered no injury in fact from the allegedly misleading language in the consent form nor has she been otherwise prejudiced by the assertedly unconstitutional feature of section 115-b", and, absent the application of "an exception to the injury-in-fact requirement for standing", she may not litigate with respect to the sufficiency of the form.

"A judicial admission is a formal stipulation by party or counsel that concedes any element of a claim or defense"

(Note, Judicial Admissions, 64 Col L Rev 1121). It is, in fact, not evidence at all, but a substitute for evidence, being conclusive of the facts admitted (Richardson, Evidence [Prince, 10th ed], § 216). In that regard, a judicial admission is equivalent to a confessory pleading (9 Wigmore, Evidence [Chadbourn rev], § 2588; see *Lloyd v R.S.M. Corp.,* 251 NY 318, 320), and generally will be enforced if "not unreasonable, not against good morals, or sound public policy" (*Matter of New York, Lackawanna & Western R. R. Co.,* 98 NY 447, 453).

An attorney can, of course, make a judicial admission on behalf of his client (McCormick, Evidence [2d ed], § 267, p 643). However, because of the serious implication of binding the client to a particular position, a statement by an attorney will not be taken as a judicial admission if made without authority (*Matter of Halpern,* 265 App Div 340). While it is generally presumed that an attorney involved in litigation has the authority to make such admissions (9 Wigmore, Evidence [3d ed], § 2594, p 597), that is not always the case. Thus, for example, it has been held that an admission made by an attorney as to the extent of injuries in a negligence suit is not binding if made without authority (*Matter of Halpern, supra*). Similarly, a stipulation which settles an action is a nullity if made without the client's consent (*Moylan v Naylor,* 12 AD2d 854).

A statement by counsel will not be treated as a judicial admission unless it was so intended by the attorney (*Matter of O'Brien v Assessor of Town of Mamaroneck,* 20 NY2d 587, 594; Note, Judicial Admissions, 64 Col L Rev 1121, 1132). In that regard the admission must be clear (*Sullivan v Dunham,* 35 App Div 342, affd 161 NY 290). To glean the attorney's intent, the record will be examined as a whole (*Matter of Way v Town of Poughkeepsie,* 75 AD2d 602, 604). Other statements or testimony in the case may demonstrate that, in fact, the attorney's statement should not be considered a judicial admission at all (*Matter of O'Brien v Assessor of Town of Mamaroneck, supra; Matter of Way v Town of Poughkeepsie, supra*).

Returning to the case at bar, I submit that the statement made by appellant's trial lawyer, Edward Papantonio, relating to whether she was misled by the form, should not

be treated as a judicial admission. There are sound policy reasons for not treating it as such. Furthermore, the record demonstrates that the attorney's statement was not intended as a judicial admission.

As already indicated, in his trial brief, Mr. Papantonio twice stated that when she signed the consent, Claire believed that she had some time in which she could unilaterally revoke her consent. During the trial, the lawyer asked Claire the following: "I refer you, particularly, to the language starting on the fifth line of the document [the consent form], and could you tell us what you understand that that language is?" The fifth through eighth lines of the form are those which bear on the consent being irrevocable unless a revocation is timely filed. An objection to the lawyer's question was sustained. Nonetheless, later on, appellant made several statements pertinent to her understanding of her rights. "I knew that when I signed it * * * that the adoption would not be completed until I signed a consent in front of the Surrogate". Elsewhere she declared, "I knew that I had a certain amount of time, even after I signed that paper", and, further, "I knew that * * * I had 30 days in which to revoke the consent". While it is true that on cross-examination appellant testified that her lawyer had "explained it [the form] to me", she never recited the content of what her lawyer had told her. It appears from her testimony that either the lawyer did not inform her of what the statute provides or that she did not comprehend what she was told.

Taken in isolation, the lawyer's statement to the effect that Claire was not misled by the form does appear to be a judicial admission. However, taking into account the rest of the record, as detailed above, it is apparent that the lawyer did not so intend it (see *Matter of O'Brien v Assessor of Town of Mamaroneck,* 20 NY2d 587, 594, *supra; Matter of Way v Town of Poughkeepsie,* 75 AD2d 602, *supra*). It is significant that the trial court did not interpret Mr. Papantonio's statement as a judicial admission, but treated the question of whether Claire was misled as a factual issue needing resolution (*Matter of Daniel C.,* 115 Misc 2d 130, 133-134, *supra*). Respondents themselves, in their appellate brief, declare that "the question of whether the natural mother was misled is so peculiarly a factual one".

A consideration of the entire record and the viewpoints of the participants in the trial leads inexorably to the conclusion that the statement by Mr. Papantonio was not intended as a judicial admission. If, on the other hand, the lawyer did intend to make a judicial admission, I submit that, for policy reasons, we should not enforce it.

It should be recalled that this portion of the discussion is predicated on the assumption, which I disagree with, that appellant's actual knowledge of her rights affects her standing to challenge the consent form. If this assumption is true, then, in the circumstance of this case, it is obvious that the two persons who are most likely to know anything on the issue are appellant herself and Edward Papantonio. That being the case, Mr. Papantonio ought to have been called as a witness by one or the other of the parties in this case. To put it succinctly, Mr. Papantonio should not have been appellant's trial lawyer at all! Because he possessed probative evidence which he ought to have testified about, he should have either disqualified himself or should have been disqualified by the court (Code of Professional Responsibility, DR 5-101 [B]; DR 5-102 [A]; *Hempstead Bank v Reliance Mtge. Corp.*, 81 AD2d 906; *North Shore Neurosurgical Group v Leivy,* 72 AD2d 598; see *People v Paperno,* 54 NY2d 294).

What makes Mr. Papantonio's participation as the trial lawyer particularly egregious is the conflict that he had with his client. Appellant's testimony suggested that at the time she signed the consent, she thought that she could still make a unilateral revocation. If this is true, Mr. Papantonio did not adequately instruct appellant as to her statutory rights prior to her signing the consent, or if his best efforts were employed, she still did not understand as indicated by her testimony. Assuming, *arguendo,* the relevance of Claire's actual knowledge of her rights, her lawyer had a choice: either admit his own failure to apprise Claire so that she understood what was involved in a section 115-b consent, or, at trial, attempt to advance the position that she was not misled by the form. Because he was faced with this conflict, Mr. Papantonio should have been forbidden to proceed as appellant's trial lawyer (*Greene v Greene,* 47 NY2d 447).

It may be the case that the fact of Mr. Papantonio's representation of appellant at trial should, in and of itself and in the interest of justice, result in a new trial (see *Fessler v Weiss,* 348 Ill App 21; *Wood v City Civ. Serv. Comm.,* 45 Cal App 3d 105; see, also, *Department of Social Servs. v Trustum C. D.,* 97 AD2d 831; *Dunn v Eickhoff,* 43 AD2d 580, affd 35 NY2d 698). At the very least, his statement, to the effect that appellant was not misled by the form, should not be considered a judicial admission which is conclusive against appellant. To so consider it is to place our imprimatur on an attorney conceding away the most vital feature of his client's case in order to resolve the conflict in his favor. Not only would this be unsound judicial policy, but it would be contrary to basic concepts of justice and fairness.

With a finding either that Mr. Papantonio's statement was not intended as a judicial admission or that sound policy prohibits its application as a judicial admission, the question of whether appellant was misled by the form or not becomes a factual one. The trial court found that she was not, focusing in large part on the lack of testimony from either appellant or her lawyer concerning what appellant's lawyer explained to her (*Matter of Daniel C.,* 115 Misc 2d 130, 134, *supra*). This reasoning is quite remarkable, considering that the trial court sustained an objection when appellant's attorney asked her what was her understanding of the form with respect to its language about revocability. I also find it disturbing that the trial court allowed Mr. Papantonio to continue as appellant's lawyer when it knew that he possessed apparently probative information which should have been revealed from the witness stand. In any case, appellant herself, at least three times, stated that she thought that she had time to retract her consent. The evidence in the record only supports a finding that she was, indeed, misled by the form. This testimony is credible, and I therefore conclude that she was misled.

It might be argued that the record is not sufficiently developed so as to enable a court to properly determine whether appellant was misled or not. Any lack of evidence concerning appellant's understanding of her rights should not be blamed on appellant, since it resulted, alternatively,

either from the court's restriction of her testimony in this regard or from her lawyer being compromised on the subject. Accordingly, at the very least, a new trial should be granted on the limited issue of what Claire understood to be her rights when she signed the form (*Matter of Way v Town of Poughkeepsie, supra;* see CPLR 4404, subd [a]), although, under the circumstances of this case, it is my view that Daniel C. should be returned to his natural mother without the necessity of any further hearings.

Despite the conclusion of my colleagues in the majority that appellant is bound by the judicial admission made by her attorney, she is not precluded from making an appropriate application to the Surrogate's Court for relief (see *Chisholm-Ryder Co. v State of New York,* 19 NY2d 848). Even when it is found that a statement constitutes a judicial admission, a party may be relieved of its conclusiveness upon a showing of good cause, such as fraud, collusion, mistake, accident or similar grounds which demonstrate that enforcement will be unjust or harsh (see *Matter of Frutiger,* 29 NY2d 143; *Carrion v Metropolitan Transp. Auth.,* 92 AD2d 907; *Wilson v Wilson,* 44 AD2d 667; *Bond v Bond,* 260 App Div 781; 2 Carmody-Wait 2d, NY Prac, Stipulations, § 7:20). Such relief will be freely accorded in the court's discretion, where no party will otherwise be prejudiced (*Teitelbaum Holdings v Gold,* 48 NY2d 51; *Matter of Frutiger,* 29 NY2d 143, *supra;* see *Matter of County Dollar Corp. v City of Yonkers,* 80 AD2d 612). Much of what has already been said concerning the circumstances of this case supports the conclusion that relief should be accorded the appellant.

Finally, it is necessary to address the majority's contention that no "exception to the injury-in-fact requirement for standing" is applicable to this case. The Court of Appeals has often reached an issue, despite lack of injury in fact to the plaintiff, where the question raised is of significant public interest and is recurring in nature (see *People v Parker,* 41 NY2d 21, 25; see, also, *People v Smith,* 44 NY2d 613, 617; *People ex rel. Donohoe v Montanye,* 35 NY2d 221). The principal question in this case, the sufficiency of the consent form used by the Surrogate's Court in extrajudicial private placement adoptions, is obviously of great public

interest and, in essence, reoccurs every time such a consent is signed. Thus, irrespective of any lack of actual injury, we should reach the merits. The majority states, however, that there are "countervailing interests" which would prohibit appellant from pursuing her claim, namely, that to allow this case to be decided on the merits "could result in grave and perhaps tragic consequences to others currently involved in the adoptive process". I have found no cases in which, on the basis of an alleged lack of standing, the Court of Appeals or this court has avoided such an important issue as is involved here, because of some countervailing interest. Essentially, what the majority is saying is that it will determine standing by first determining how it will come out on the issues involved. If the expected conclusion is unsettling, the court will avoid addressing the issue in the first instance. However, standing should turn on what issues are to be decided, not on how they are to be decided (see *Warth v Seldin,* 422 US 490, 500, *supra*).

Furthermore, and more to the heart of the issue, what is "grave" and "tragic" is that the law would countenance and, even worse, design a deceptive consent form for private placement adoptions. The law should encourage and facilitate adoptions, for it is vital that all children should have a parent. However, to take away a child from his natural parent and give him to adoptive parents, where there is no evidence that the natural parent is unfit and where the consent form to adoption is misleading, serves no legitimate purpose. To the contrary, allowing such an adoption undermines the family unit.

In conclusion, the consent form that the natural mother signed neither complied with section 115-b of the Domestic Relations Law, nor did it comport with basic concepts of due process. In the context of adoptions, a strict compliance with statutory and due process requirements is required, and standing is not dependent on whether or not the mother was, in fact, misled by the form. The natural mother's standing to challenge the form exists simply because she signed it. In any event, the record shows that she was misled by the form, and the statement by appellant's trial attorney to the contrary should not be credited as a judicial admission. Furthermore, the significant public import of the issues at bar requires that we address the

merits of this appeal. The order appealed from should be reversed, the petition for adoption should be dismissed, and the child, Daniel C., should be forthwith returned to his mother.

THOMPSON and WEINSTEIN, JJ., concur with LAZER, J. P.; GIBBONS, J., dissents and votes to reverse the order appealed from and dismiss the petition by the adoptive parents for adoption, with an opinion.

Order of the Surrogate's Court, Westchester County, dated August 12, 1982, affirmed, without costs or disbursements.