OPINION OF THE COURT
 

 Chief Judge Cooke.
 

 The Legislature has provided that landowners who gratuitously allow persons to use their property for certain enumerated recreational activities such as hiking, fishing, hunting, and off-road vehicle travel are not liable for injuries unless caused by willful or malicious acts or omissions of the owner. There being nothing to the contrary in the law, this protection is available to the State itself when no fee is charged for pursuing these activities on publicly owned property.
 

 I
 

 The cases before the court today raise the scope and application of section 9-103 of the General Obligations Law. Generally, that statute provides that a person in possession of property owes no duty of care to others who
 
 *187
 
 use it for a broad variety of recreational activities unless a charge is exacted for use of the property or there is a willful or intentional failure to guard or to warn against a dangerous condition.
 
 [1]
 
 Claimants here were each injured while on State-owned land. The particulars of their accidents and the proceedings below are outlined briefly.
 

 (A) SEGA V STATE OF NEW YORK
 

 Claimant Sega was injured on July 14, 1976, while hiking with others in the Catskill Forest Preserve near the Peekamoose Campsite, an undeveloped camping ground with limited improvements. The area was largely unsupervised, with , only occasional visits by State agents for gar
 
 *188
 
 bage collection and maintenance. An unpaved road to the campsite crossed a bridge which had pipe guardrails, suppprted by vertical pipes and T-couplings about 8-10 feet apart. A locked chain stretched across the bridge to prevent access to unauthorized vehicles. Claimant and her friends had been hiking for some time when they reached the bridge. Deciding to rest, claimant perched herself on the railing after shaking it to verify its stability. As she sat facing the creek some 18-20 feet below, the pipe pulled loose from its support after a short time. Claimant fell to the creek and was seriously injured.
 

 Claimant commenced this action against the State on a simple negligence theory. At trial, claimant established that a vehicle had struck the cross chain on the previous Labor Day weekend, about 10 months earlier. As a result of that accident, the railing’s end support had been bent. State employees had visited the scene and determined that the damage was minor and no repairs were necessary. As did claimant, they had checked the railing by shaking it vigorously to ascertain its firmness.
 

 Claimant had seated herself about 16 feet from the end of the bridge. The pipe that she was sitting on pulled loose from the second vertical support. Claimant presented an engineer who opined that the Labor Day accident had caused this second support to twist inward sufficiently to weaken the top rail from its couplings, and that claimant’s weight caused it to pull free completely.
 

 The Court of Claims found that the State had not been negligent. On appeal, the Appellate Division considered section 9-103 of the General Obligations Law, which had not been invoked at trial. The majority concluded that the statute was properly before that court and that claimant had failed to establish any willful or intentional act by the State so as to justify imposing liability upon it.
 

 (B) CUTWAY V STATE OF NEW YORK
 

 In April, 1975, the State purchased approximately 4,200 acres of land (known as the “Schuler property”) as part of the Adirondack Forest Preserve. When acquired, the land had a gravel road that meandered through the property for about five miles. Access to the road was limited by a two-
 
 *189
 
 board wooden gate mounted on fieldstone pillars. On each side of the pillars was a fieldstone wall connected to a rail fence extending to the woods. The State padlocked this main gate to restrict vehicular access to the property, but unknown persons broke down and removed a portion of the rail fence to circumvent this obstacle. Buildings on the property were subjected to burglaries and vandalism during the summer of 1975.
 

 In an effort to thwart further damage to the buildings, the State adopted another tack. During the fall of 1975, the main gate was unlocked, but a 10-inch by 20-inch sign was posted declaring the road to be barred to public vehicles. A new gate was installed 491 feet past the main gate. This second gate consisted of two steel well casings set in cement on each side of the roadway with a five-eighths inch steel cable stretched between the posts. When installed, the cable and posts were painted yellow and two red reflectors were hung from the cable. The cable gate was set at a low point in the road. Approaching from the direction of the main gate, the road was fairly straight. Coming from the other direction, however, the road made a sharp turn about 125 feet before the cable gate. No signs warning of the cable were posted anywhere.
 

 On April 18, 1976, claimant and his brother-in-law entered the Schuler property through the main gate. They were riding three-wheeled all-terrain vehicles. Once through the main gate, they immediately left the gravel road and began riding at random through the forest. The two eventually returned to the gravel road and traveled along it towards the main gate at about 20-25 miles per hour. Claimant’s brother-in-law saw the cable in time to avoid it, but claimant struck it, receiving severe injuries to his neck and upper chest. At the time of the accident, the cable had not been inspected since the previous autumn, the reflectors were missing, and the yellow paint had worn off enough to impair the cable’s visibility.
 

 At trial, the State relied on section 9-103. The Court of Claims agreed that the statute was applicable and found that the State had not acted “maliciously or wantonly” in installing the gate. The court found, however, that the cable gate constituted a trap or an inherently dangerous
 
 *190
 
 structure and that the State should have posted a warning sign on the road approaching the gate from the Schuler property’s interior. Taking into consideration claimant’s rate of speed, the court found the State to be 80% liable for claimant’s damages. The Appellate Division unanimously affirmed on reasoning essentially the same as that of the lower court.
 

 II
 

 These appeals present the question whether the State may invoke section 9-103 in defense of claims for injuries occurring on State-owned lands. If so, then the manner of the statute’s application must be determined.
 
 [2]
 

 On its face, section 9-103 unambiguously includes public property within its purview. By its terms, section 9-103 refers to
 
 any
 
 “owner, lessee or occupant of premises” without limiting the scope of that clause to private landowners. In addition, the statute refers to ECL 11-2111. ECL 11-2111 pertains to posting lands as fishing and hunting preserves, including “any lands or waters, rights or interests therein owned, leased or otherwise acquired by the state” (ECL 11-2101, subd 1, par d, referenced in ECL 11-2111, subd 1). This confirms that the Legislature intended to provide protection to the State as well as to private landowners.
 

 Claimants in both actions argue that the legislative history indicates that section 9-103 and its predecessor were intended to apply to private land only (see Memorandum of Joint Legislative Committee on Revision of Conservation Law, McKinney’s Sess Laws of NY, 1956, pp 1943-1944). Their argument, at most, does nothing more than urge ambiguity where none exists. Generally, a statute is
 
 *191
 
 to be construed according to the ordinary meaning of its words
 
 (Riegert Apts. Corp. v Planning Bd.,
 
 57 NY2d 206, 209; but see
 
 Uniformed Firefighters Assn. v Beekman, 52
 
 NY2d 463, 471 [“‘the absence of ambiguity facially is never conclusive’ ”]), and resort to extrinsic matter is inappropriate when the statutory language is unambiguous and the meaning unequivocal
 
 (People v Graham, 55
 
 NY2d 144, 151;
 
 New Amsterdam Cas. Co. v Stecker,
 
 3 NY2d 1, 5-6). While legislative intent is the great and controlling principle
 
 (Matter of Petterson v Daystrom Corp.,
 
 17 NY2d 32, 38), it should not be confused with legislative history, as the two are not coextensive. Inasmuch as the legislative intent is apparent from the language of section 9-103, there is no occasion to consider the import, if any, of the legislative memorandum.
 

 Section 9-103 being applicable to State property, attention is now turned to the statute’s effect. In the lower courts (except, of course, the Sega trial court), the law was characterized as a codification of the common law existing in 1956, when the predecessor statute to section 9-103 was enacted (L 1956, ch 842). Having commenced on this path of reasoning, the courts concluded that each claimant’s status as trespasser, licensee, or invitee was determinative of the State’s duty to protect or to warn against dangerous conditions. Claimants have adopted this position on the present appeal. It must be rejected.
 

 Nothing in the statute suggests that it was meant to codify the common law. It does not refer to trespassers, licensees, or invitees in general terms. Its scope is restricted to a limited number of activities. Indeed, the statute is contrary to the common law existing in New York in 1956. At that time, the occupier of premises was not liable to a licensee unless the occupier knew of the dangerous condition, realized that it involved an unreasonable risk, believed that the guest would not discover the condition or comprehend the risk, and then failed to exercise reasonable care in warning of the condition or risk (see
 
 Higgins v Mason, 255
 
 NY 104, 109-110). In contrast, section 9-103 and its predecessors impose liability only if there is a willful or malicious failure to warn. And the statute does not indicate any intent to except traps or concealed defects from this standard.
 

 
 *192
 
 Moreover, the policy in this State is to determine a landowner’s duty of care on the basis of foreseeability, not on rigid classifications. In
 
 Basso v Miller
 
 (40 NY2d 233), this court abandoned the common-law classifications of trespasser, licensee, and invitee. This course was chosen partly because “ The classifications and subclassifications bred by the common law have produced confusion and conflict’ ”
 
 (id.,
 
 at p 240, quoting
 
 Kermarec v Compagnie Generale,
 
 358 US 625, 631). On its face, section 9-103 imposes a single standard. We see no reason to reintroduce confusion and conflict by interpreting' the statute as a retention of the common-law classifications.
 

 In short, when a plaintiff is confronted with a defense based on section 9-103, discernment of his or her burden is relatively simple. Assuming that the statute applies, plaintiff must prove that the defendant willfully or maliciously failed to guard or to warn against a dangerous condition, use, structure, or activity. The defendant’s negligence, if any, is immaterial.
 

 Claimant Cutway tried his suit with notice that the State was relying on section 9-103 as a defense. Claimant was upon the Schuler property to operate a motorized vehicle for recreational purposes, so the statute is pertinent here. The affirmed findings of fact establish that The State may have been negligent in constructing the cable gate and failing to post warnings, but there is nothing to show that its conduct was willful or malicious. Therefore, there was no basis for imposing liability on the State for claimant’s injuries.
 

 Claimant Sega did not have the benefit of trying her case with notice that section 9-103 would be invoked. A new trial, however, is not necessary. In tort law, the standard of conduct is a matter of degree measured against a “sliding scale, by which the defendant’s liability is least where his conduct is merely inadvertent, greater when he acts in disregard of consequences increasingly likely to follow, greater still when he intentionally invades the rights of another under a mistaken belief that he is committing no wrong, and greatest of all where his motive is a malevolent desire to do harm” (Prosser, Torts [4th ed], § 7, p 31; see
 
 id.,
 
 at § 8, p 32). The standard imposed by section 9-103 re
 
 *193
 
 quires a graver act than mere negligence before liability may be imposed. Presumably, claimant has adduced all of her evidence pertaining to the State’s conduct. She does not argue that she could have negatived the defense posed by section 9-103 through the presentation of other evidence, such as paying a fee for admission to the park. Although claimant was not walking when she was injured, the acts of sitting and resting are sufficiently related to traveling through the woods on foot to justify the conclusion that she was “hiking” when the accident occurred. The legal issue presented, then, is whether there is sufficient evidence to sustain a judgment for claimant under the strictures of section 9-103. As in Cutway, claimant shows nothing to support a finding that the State acted willfully or maliciously when it failed to discover or to warn about the defect in the bridge’s railing. There is, therefore, no ground for recovery by claimant.
 

 Accordingly, in Sega v State of New York, the order of the Appellate Division should be affirmed, with costs. In Cutway v State of New York, the order of the Appellate Division should be reversed, with costs, and the claim dismissed.
 

 Judges Jasen, Jones, Wachtler, Meyer, Simons and Kaye concur.
 

 In
 
 Sega v State of New York:
 
 Order affirmed, with costs.
 

 In
 
 Cutway v State of New York:
 
 Order reversed, with costs, and claim dismissed.
 

 [1]
 

 . The full text of section 9-103 reads:
 

 “89-103. No duty to keep premises safe for certain uses; responsibility for acts of such users
 

 “1. Except as provided in subdivision two,
 

 “a. an owner, lessee or occupant of premises, whether or not posted as provided in section 11-2111 of the environmental conservation law, owes no duty to keep the premises safe for entry or use by others for hunting, fishing, canoeing, boating, trapping, hiking, cross-country skiing, speleological activities, horseback riding, bicycle riding, hang gliding, motorized vehicle operation for recreational purposes, snowmobile operation, cutting or gathering of wood for noncommercial purposes or training of dogs, or to give warning of any hazardous condition or use of or structure or activity on such premises to persons entering for such purposes;
 

 “b. an owner, lessee or occupant of premises who gives permission to another to pursue any such activities upon such premises does not thereby (1) extend any assurance that the premises are safe for such purpose, or (2) constitute the person to whom permission is granted an invitee to whom a duty of care is owed, or (3) assume responsibility for or incur liability for any injury to person or property caused by any act of persons to whom the permission is granted.
 

 “c. an owner, lessee or occupant of a farm, as defined in section six hundred seventy-one of the labor law, whether or not posted as provided in section 11-2111 of the environmental conservation law, owes no duty to keep such farm safe for entry or use by a person who enters or remains in or upon such farm without consent or privilege, or to give warning of any hazardous condition or use of or structure or activity on such farm to persons so entering or remaining. This shall not be interpreted, or construed, as a limit on liability for acts of gross negligence in addition to those other acts referred to in subdivision two of this section.
 

 “2. This section does not limit the liability which would otherwise exist
 

 “a. for willful or malicious failure to guard, or to warn against, a dangerous condition, use, structure or activity; or
 

 “b. for injury suffered in any case where permission to pursue any of the activities enumerated in this section was granted for a consideration other than the consideration, if any, paid to said landowner by the state or federal government, or permission to train dogs was granted for a consideration other than that provided for in section 11-0925 of the environmental conservation law; or
 

 “c. for injury caused, by acts of persons to whom permission to pursue any of the activities enumerated in this section was granted, to other persons as to whom the person granting permission, or the owner, lessee or occupant of the premises, owed a duty to keep the premises safe or to warn of danger.
 

 “3. Nothing in this section creates a duty of care or ground of liability for injury to person or property.”
 

 [2]
 

 . In Sega, a threshold issue is presented as to whether the Appellate Division acted properly in considering section 9-103, which was not mentioned by the State until the case was on appeal. The lower court split on its power to consider the statute “in the interests of justice.” On different reasoning, this court finds nothing objectionable in the Appellate Division’s action. On appeal, a respondent may proffer in support of affirmance any legal argument that may be resolved on the record, regardless of whether it has been argued previously, if the matter is one which could not have been countered by the appellant had it been raised in the trial court (see
 
 Scott v Morgan,
 
 94 NY 508,515; cf.
 
 Maloney v Hearst Hotels Corp.,
 
 274 NY 106, 111;
 
 Persky v Bank of Amer. Nat. Assn.,
 
 261 NY 212, 217-218;
 
 Nicholson v Greeley Sq. Hotel Co.,
 
 227 NY 345, 349;
 
 People v Bresler,
 
 218 NY 567, 571). Under this standard, it was not inappropriate for the Appellate Division to rule on the basis of section 9-103 (see discussion, at p 193,
 
 infra).
 
 Similarly, the matter is properly before this court as an argument in support of affirmance.