THERESA O'KEEFE, Individually and as Administratrix of the Estate of DAVID O'KEEFE, Deceased, Appellant, v STATE OF NEW YORK, Respondent. (Appeal No. 1.)

THERESA O'KEEFE, Individually and as Administratrix of the Estate of THOMAS J. O'KEEFE, Deceased, Appellant, v STATE OF NEW YORK, Respondent. (Appeal No. 2.)

THERESA O'KEEFE, Individually and as Administratrix of the Estate of MARK O'KEEFE, Deceased, Appellant, v STATE OF NEW YORK, Respondent. (Appeal No. 3.)

Fourth Department, November 7, 1984

### APPEARANCES OF COUNSEL

*Miserendino, Krull & Foley, P.C.* (*Samuel Miserendino* of counsel), for appellants.

*Robert Abrams, Attorney-General* (*Vernon Stuart* and *Peter J. Dooley* of counsel), for respondent.

### OPINION OF THE COURT

HANCOCK, JR., J.

These wrongful death claims arise from three accidental drownings which occurred on May 22, 1974 at the Beaver Island State Park Marina, a public recreational facility owned and

operated by the State of New York. The decedents, all members of the O'Keefe family, were on the marina piers for the purpose of fishing in the Niagara River, a permitted activity for which the marina was open to the public. The court held that the claims were within the purview of section 9-103 of the General Obligations Law which provides that landowners who gratuitously allow persons to use their property for certain enumerated recreational activities such as fishing, hunting and off-road vehicle travel are not liable to persons injured on the property except for "willful or malicious failure to guard, or to warn against, a dangerous condition, use, structure or activity" (General Obligations Law, § 9-103, subd 2, par a). Finding no evidence of "willful or malicious" conduct, the court concluded that the State had fulfilled its limited duty to the victims and dismissed the claims. For reasons which follow, we hold that section 9-103 of the General Obligations Law was not intended to be applied to a claim against the State or a municipality (like those asserted here) for negligence in operating and maintaining a public park or recreational facility. The judgment should, therefore, be reversed and the claims remitted for further proceedings as hereinafter set forth.

Section 9-103 of the General Obligations Law, if applied to governmental operation of parks and recreational facilities, would work a marked change in the rules pertaining to liability of the State and municipalities to the public for negligence in such undertakings. The statute affords total immunity from suits based on a failure "to keep the premises safe for entry or use by others for [specifically enumerated activities] or to give warning of any hazardous condition or use of or structure or activity on such premises to persons entering for such purposes" (General Obligations Law, § 9-103, subd 1, par a), unless "the defendant *willfully or maliciously* fail[s] to guard or to warn against a dangerous condition, use, structure, or activity" (*Sega v State of New York*, 60 NY2d 183, 192; emphasis added). Absent the lesser standard of care prescribed by section 9-103 for the enumerated activities, the standard to be applied in a claim like those here would be that traditionally applied in assessing the conduct of a governmental unit for furnishing and maintaining parks and recreational facilities for the public, i.e., the standard of ordinary care (see *Preston v State of New York*, 59 NY2d 997; *Scurti v City of New York*, 40 NY2d 433; *Basso v Miller*, 40 NY2d 233; *Caldwell v Village of Island Park*, 304 NY 268; *Leone v City of Utica*, 66 AD2d 463, affd 49 NY2d 811; *Jacques v Village of Lake Placid*, 39 AD2d 163, affd 32 NY2d 739; *Burkart v State of*

*New York,* 50 Misc 2d 912, affd 28 AD2d 1167; 42 NY Jur, Parks and Recreation Centers, § 70).

In *Sega v State of New York (supra),* the court emphasizes that the effect of the statute is not merely to define the degree of responsibility of an owner, lessee, or occupant of land as that formerly owed (in 1956 when the statute was enacted) to one entering the premises as a licensee (see *Sega v State of New York, supra,* p 191, stating that an occupier of premises under the statute was liable to a licensee only where he "knew of the dangerous condition, realized that it involved an unreasonable risk, believed that the guest would not discover the condition or comprehend the risk, and then failed to exercise reasonable care in warning of the condition or risk"). The duty of a possessor of land under the statute, the court notes, is *even less* and for him to be held responsible there must be proof that he *"willfully or maliciously* failed to guard or to warn against a dangerous condition, use, structure or activity" (*Sega v State of New York, supra,* p 192; emphasis added). In sum, when applied, as here, in the context of a claim based on the operation of a municipal or State park or recreational facility, the statute effects a drastic change in the governing rule, i.e., from liability under the "ordinary care" standard to immunity for liability for all conduct except that which is willful or malicious.

The question before us, then, is whether the Legislature could have intended that the State enjoy the extraordinary degree of immunity granted by section 9-103 with regard to the claims asserted here — ones that but for the fact that the O'Keefes were on the premises for fishing (an activity enumerated in § 9-103) would be governed by the traditional standard of ordinary care. In approaching the question, we must reemphasize that the O'Keefe claims are based on the State's negligence in the active management of its marina, its failure to provide adequate supervision and police protection and, most importantly, its failure to provide lifesaving equipment.[1]

The legislative history of the statute[2] and the purpose underlying its enactment, as well as the statutory language imple-

---

**1.** In its decision, the Court of Claims sets forth the basis for the asserted liability: "The alleged negligence is identical in each claim, and in summary states that the defendant was negligent in failing to have lifesaving equipment available at the marina for the protection of those lawfully utilizing the facility; that the inlet was a dangerous condition that was not discernible to fishermen on the boardwalk piers, and the current flowing through this area constituted an unreasonable risk of harm to those who might fall into the waters of the marina. The claimant also takes the position that if lifesaving equipment could not economically be provided, the defendant was negligent in failing to close the marina to fishing during the off season."

**2.** We note that the *Sega* court's rejection of arguments based on legisla-

menting that purpose, unmistakably refute the State's contention that the Legislature in adopting section 9-103 of the General Obligations Law intended to confer immunity on the State for negligence in the operation and maintenance of a system which it has designed and constructed and which it operates, maintains and holds out to the public as a facility for specific recreational activities (e.g., as in the case at bar for boating during the summer season and fishing in the off season).

The statute as originally enacted was entitled "No duty to keep premises safe for hunters, trappers or fishermen or for acts of such persons" and encompassed only the activities of hunting, trapping, fishing and the training of dogs (Conservation Law, § 370, as added by L 1956, ch 842). The bill jacket refers to "the anxiety of owners, lessees and occupants of premises suitable for hunting, fishing and trapping that unless they exclude sportsmen, they may be held liable for injuries suffered by such persons" and continues: "To overcome this attitude, the bill, in effect, declares that persons entering for the purpose of hunting, fishing, trapping or training of dogs, have the status of 'licensees', who take the premises as they find them and assume the risk" (bill jacket to L 1956, ch 842, at p 18).

After the statute was recodified as section 9-103 of the General Obligations Law (L 1963, ch 576), subsequent amendments expanded its scope to include new activities such as hiking, horseback riding, snowmobiling and hang gliding. The memorandum accompanying the amendment to include cross-country skiing (L 1978, ch 187) states: "Amending section 9-103 of the general obligations law will open up vast areas of private Adirondack land for ski touring. This proposal protects the private landowner[s] by greatly limiting their liability, and encourages these property owners to open their lands to the general public for recreational use" (NY Legis Ann, 1978, p 150). With respect to the amendment concerning cutting and gathering firewood (L 1979, ch 336), the legislative memorandum reads: "Owners of wood lots * * * may be reluctant to permit their neighbors to cut and gather firewood because of the possibility of lawsuits. Were liability limited, there would be greater opportunities to use this form of energy for home heating" (NY Legis Ann, 1979, p 207).

---

tive history (see *Sega v State of New York,* 60 NY2d 183, 190-191) pertains only to the question of whether section 9-103 of the General Obligations Law may be read to include State-owned lands in appropriate circumstances, the answer to which, the court concluded, was clear from the face of the statute. Nothing in that decision precludes us from referring to legislative history in considering an entirely different question, viz., the nature of the property and the types of claims which are within the reach of the statute.

In keeping with the statute's history and purpose, section 9-103 (subd 1, par a) absolves "an owner, lessee or occupant of premises" from any duty "to *keep the premises safe* for entry or use by others * * * or to *give warning* of any hazardous condition or use * * * to persons entering for such purposes" (emphasis added). These are duties which would traditionally have been owed by a landholder to a licensee.[3] Nothing in the wording of the statute suggests that it was intended to alter the duty of ordinary care owed by possessors of land to invitees — either public invitees or business visitors.[4] On the contrary, the express exclusion in the statute (General Obligations Law, § 9-103, subd 2, par b) for claims by invitees who have paid a consideration to enter the premises clearly shows, we think, that the statute was intended to be limited to claims by licensees.

Moreover, a construction which greatly reduces the duty of care of governmental units in the operation of their public parks serves no discernible public interest and certainly not one that is consistent with the stated purpose of section 9-103, i.e., encouraging a possessor of land to permit persons to come upon his property for the purposes of hunting, fishing and other outdoor recreational activities. Obviously, there is no need to encourage a governmental entity which builds, operates and maintains a public recreational complex to open it for public use. On the other hand, application of the statute to a possessor of undeveloped land could reasonably be expected to serve that purpose. We observe also that a possessor of a tract of land already enjoyed at the time of the statute's enactment some measure of immunity from liability owed to someone coming on the land

---

**3.** The court in *Basso v Miller* (40 NY2d 233, 244, Breitel, Ch. J, concurring) characterized the duty owed to a licensee as "the obligation to refrain from committing acts of 'affirmative negligence' and to exercise reasonable care to disclose dangerous defects known to the possessor and unlikely to be discovered by the licensee". (See, to the same effect, *Sega v State of New York,* 60 NY2d 183, 191.) The *Basso* court noted that a second line of authority imposed a lesser duty (comparable to that imposed by section 9-103), i.e., a duty to refrain from inflicting willful or wanton injury (*Basso v Miller, supra,* p 244).

**4.** "An 'invitee' is subdivided into two categories, a public invitee and a business visitor (see Restatement, Torts 2d, § 332, subd [1]). A public invitee is one who, as a member of the public, is invited to enter or remain on property which is held open to the public * * * A business visitor is one who is invited to remain on property for a purpose directly or indirectly connected with business dealings with the possessor of the property * * *

"The duty owed to an invitee is to use due care to keep the property in a reasonably safe condition so that invitees will not unnecessarily be exposed to danger * * * This includes an obligation to warn an invitee of any hidden danger if the possessor is unable to maintain the property in a reasonably safe condition" (*Basso v Miller,* 40 NY2d 233, 244-245, Breitel, Ch. J., concurring).

with the possessor's permission (see, generally, *Sega v State of New York, supra,* p 191; *Basso v Miller, supra,* p 244; see discussion, *supra,* pp 45 and 47, n 3). Conferring the rather small increment of additional protection afforded by section 9-103 in such circumstances seems entirely reasonable, particularly since as originally enacted the legislation was envisioned as applying to tracts of wild or undeveloped property suitable for hunting, fishing and trapping (like that at the Adirondack Forest Preserve in *Cutway v State of New York,* decided with *Sega v State of New York,* 60 NY2d 183, *supra*) which the owner could not reasonably be expected to inspect or maintain in a safe condition. From the foregoing it appears `hat the Court of Claims construction of section 9-103 would grant immunity from claims *unlike* the typical claim by a licensee which the statute was designed to cover.

If the Court of Claims has correctly construed section 9-103 of the General Obligations Law as applying to persons on the piers of Beaver Island State Park Marina for the purpose of fishing, some anomalous consequences of that construction necessarily follow. For example, had claimants been on the piers to go swimming (an activity not enumerated in General Obligations Law, § 9-103), the statute would not apply and liability would depend, as in *Jacques v Village of Lake Placid* (39 AD2d 163, affd 32 NY2d 739, *supra*), on whether adequate steps had been taken to prohibit swimming. If, on the date of the accident in 1974, the O'Keefe family had come to the marina by boat, the statute would not have applied (boating was not added as an enumerated activity until 1979 [see L 1979, ch 408]); or if claimants had entered the marina for an evening stroll, the statute would not apply and liability would depend on the ordinary rules. The point is that, adopting the State's construction, the determination of whether statutory immunity applies with its far-reaching impact upon the degree of care owed (i.e., either a duty of ordinary care or a duty of only refraining from conduct which is willful and malicious) becomes dependent on a factor which bears no relationship to the risk of harm or the State's ability to prevent it, i.e., whether or not the activity for which the injured person enters the premises happens to be one that is enumerated in the statute (General Obligations Law, § 9-103). Whether a person permitted on the piers of the State-operated marina is there for the purpose of bird-watching or shooting ducks, the risk is the same, and it would be an absurdity if the Legislature intended that he should recover in one case but not in the other. Such a construction should be avoided (see McKinney's Cons Laws of NY, Book 1, Statutes, § 145).

Our position is consistent with decisions construing section 9-103. Except for *Mattison v Hudson Falls Cent. School Dist.* (91 AD2d 1133), all involve tracts of relatively undeveloped land (see *Sega v State of New York,* 60 NY2d 183, *supra; Curtiss v County of Chemung,* 78 AD2d 908; *La Carte v New York Explosives Corp.,* 72 AD2d 873; *Rock v Concrete Materials,* 46 AD2d 300; *Wight v State of New York,* 93 Misc 2d 560; see, also, *Michalovic v Genesee-Monroe Racing Assn.,* 79 AD2d 82, holding that section 9-103 did not insulate the owner and operator of a racetrack from a claim by one injured while driving a motorcycle in a vacant racetrack parking lot). For example, the two cases in *Sega* involve forest preserves. To the extent to which *Mattison v Hudson Falls Cent. School Dist. (supra)* stands for the proposition that a governmental entity is exempt from liability for injuries sustained by someone using park facilities for the purpose for which the park was designed, we cannot agree with its result. We note, however, that unlike claimants here the plaintiffs in *Mattison,* who were snowmobiling in a baseball field, were using the park for a purpose other than that for which it was held open to the public.

In sum, the conclusion that the statute applies *because* the marina is operated for an enumerated recreational activity (i.e., "fishing", General Obligations Law, § 9-103, subd 1, par a) and *because* the O'Keefes were using it for such purpose is, in our opinion, contrary to the intent of the statute as derived from its wording and history and incompatible with the legislative scheme of offering encouragement (through the device of granting statutory immunity) to those persons (who might otherwise be reluctant to do so) to open up their lands for public recreational use.

The judgments should, therefore, be reversed on the law alone. We make no factual findings. In the exercise of our discretion, we should remit the claims to the trial court for a determination as to the liability of the State under the applicable rules as stated herein and for other and further proceedings including a determination of damages if warranted (see CPLR 5712, subd [c]; *Hacker v City of New York,* 26 AD2d 400, 403, affd 20 NY2d 722, cert den 390 US 1036; *Hurwitz v Hurwitz,* 3 AD2d 1009; 11 Carmody-Wait 2d, NY Prac, § 72:159).

MOULE, J. (dissenting). The primary question on this appeal concerns the scope and application of section 9-103 of the General Obligations Law which provides that landowners who gratuitously allow persons to use their property for certain enumerated recreational activities such as fishing, hunting and off-road

vehicle travel are not liable for injuries unless caused by willful or malicious acts or omissions of the owner.

The State owns and operates Beaver Island State Park located on Grand Island in the Niagara River. A marina is operated within the park, exclusively for boating, between Memorial and Labor Days. During the remainder of the year, the public is allowed to use the marina for recreational fishing; no fee of any kind is charged.

The marina is a man-made facility built within two parallel walls which run out from the island into the river partially blocking its flow. To prevent stagnation of marina water, single openings are cut into each wall and are set at different distances from shore. Current enters through the inlet in the upstream wall and "flushes" through the marina exiting the downstream wall outlet. The openings are not readily visible because of boardwalk piers constructed over the lengths of the walls. Hand-railings are constructed on the outerside of each wall, but there are none on the marina side.

Due to theft and vandalism, lifesaving equipment including life-rings, ropes and poles are provided within the marina only between Memorial and Labor Days.

On the evening of May 22, 1974 David O'Keefe, 41 years old, and his two sons, Mark, age 16, and Thomas, age 9, were fishing at the marina. Mark's girlfriend, Susan Tramp Blanford, was with them. They began fishing from various points along the upstream wall. Thomas and his father proceeded further out and began fishing from the end of the wall. After some time, while it was still daylight, Thomas and his father began walking down the wall back toward the area in which Mark and Susan were fishing. David was walking on the side closest to the handrail; young Thomas was walking on the marina side. Inexplicably, Thomas fell into the marina water in the area of the inlet. David jumped in, attempting to rescue his son. Thereafter, both Mark and Susan entered the marina water in an effort to rescue David and Thomas. Though they were good swimmers, all three O'Keefes drowned when they were apparently swept under by the cold flushing current. Susan was rescued by another fisherman, Ralph Dyson, who risked his life to pull her to safety. Both Dyson and Blanford's testimony strongly showed that were lifesaving equipment available, all three O'Keefes would have been saved.

Claimant, the administratrix of the estate of David, Mark and Thomas O'Keefe, commenced this action alleging that the deaths were due to failure of the State to properly supervise the

marina, in failing to have lifesaving equipment available at the marina for the protection of people lawfully there, and in failing to warn users of the area of the existence of dangerous currents in the water surrounding the marina.

At trial, after the close of proof, the Court of Claims granted defendant's motion for judgment as a matter of law. The court held that section 9-103 of the General Obligations Law set the duty of care owed by the State to claimant and that the State had fulfilled its duty.

Claimant raises two contentions on appeal: (1) that section 9-103 of the General Obligations Law is inapplicable to her claims and that she has established the negligence of the State; and, alternatively, (2) that the proof showed that the State's conduct in failing to guard or warn against a dangerous condition was "willful or malicious".

Claimant's first contention is that section 9-103 of the General Obligations Law is inapplicable because the statute was not intended to apply to "highly developed" property such as the man-made marina at Beaver Island State Park. Upon this basis, she argues that *Sega v State of New York* (60 NY2d 183) is inapplicable and our decision in *Michalovic v Genesee-Monroe Racing Assn.* (79 AD2d 82) excepts this case from the scope of the statute.

Section 9-103 of the General Obligations Law provides in part:

"No duty to keep premises safe for certain uses; responsibility for acts of such users

"1. Except as provided in subdivision two,

"a. an owner * * * of premises * * * owes no duty to keep the premises safe for entry or use by others for hunting, fishing [etc.] or to give warning of any hazardous condition or use of or structure or activity on such premises to persons entering for such purposes;

"b. an owner * * * of premises who gives permission to another to pursue any such activities upon such premises does not thereby (1) extend any assurance that the premises are safe for such purpose, or (2) constitute the person to whom permission is granted an invitee to whom a duty of care is owed, or (3) assume responsibility for or incur liability for any injury to person or property caused by any act of persons to whom the permission is granted * * *

"2. This section does not limit the liability which would otherwise exist

"a. for willful or malicious failure to guard, or to warn against, a dangerous condition, use, structure or activity; or

"b. for injury suffered * * * where permission * * * was granted for a consideration".

In *Sega (supra)*, the Court of Appeals held that the State may invoke section 9-103 in defense of claims or injuries occurring on State-owned lands. Rejecting the argument that the legislative history of section 9-103 limited its scope to private lands, the court reasoned that resort to legislative history was inappropriate to interpret the statute because its language was unambiguous. It said: "While legislative intent is the great and controlling principle (*Matter of Petterson v Daystrom Corp.*, 17 NY2d 32, 38), it should not be confused with legislative history, as the two are not coextensive. Inasmuch as the legislative intent is apparent from the language of section 9-103, there is no occasion to consider the import, if any, of the legislative memorandum." (60 NY2d 183, 191, *supra*.) Claimant attempts to distinguish *Sega* on the basis that the question presented concerned only to whom the statute was applicable, and not the nature of the property falling within its scope. Thus, she argues, that resort to the statute's legislative history is appropriate here. Even assuming claimant's distinction of *Sega* is proper, reliance upon *Michalovic v Genesee-Monroe Racing Assn. (supra)* to except this case from section 9-103 is misplaced.

In *Michalovic (supra)*, after examining the legislative history of section 9-103, we held that the statute was inapplicable to an accident involving a 14-year-old boy injured while riding a motorbike in the parking lot at the Batavia Downs Race Track. We reasoned that the purpose of the statute was to increase access to lands suitable for the listed recreational activities and that the commercial property in question was not of the nature contemplated by the Legislature as within the protective scope of the statute.

In contrast to the commercial property used for recreational activity in *Michalovic (supra)*, the marina at Beaver Island is suitable only for recreational activities, e.g., boating or fishing. It is a recreational property that the O'Keefes used for recreational purposes. That the marina is "highly developed" is of no consequence. Although the piers and breakwalls are man-made, they enhance the marina's suitability for fishing rather than alter its character and destroy its compatibility with such recreational use. The marina is thus precisely the type of recreational facility contemplated by the Legislature when it enacted the statute. To impose a duty on the State to provide safety equip-

ment and warnings or close the marina during the "off-season" as suggested by claimant is exactly the result that section 9-103 was intended to avoid.

Section 9-103 was thus properly relied on by the Court of Claims in determining the standard of care owed to claimant by the State.

Claimant's alternative contention, that the proof showed that the State's conduct in failing to guard against a dangerous condition was "willful or malicious", is also without merit.

In *Sega v State of New York* (*supra*), the court rejected claimants' proposition that the State's liability under section 9-103 varied depending on whether the injury was caused by a known dangerous condition, e.g., a "hazard" or a "trap". Noting that the statute abrogated the common-law duty of landowners to warn licensees of known unreasonably dangerous conditions not likely to be discovered by them, the court said, "In contrast, section 9-103 and its predecessors impose liability only if there is a willful or malicious failure to warn. And the statute does not indicate any intent to except traps or concealed defects from this standard" (60 NY2d 183, 191, *supra*). Applying section 9-103 to the consolidated appeals before it,* the Court of Appeals held that it was not enough that the claimant in *Cutway v State of New York* (89 AD2d 406) was injured due to the State's negligence in constructing a cable gate without posting warning signs to alert all terrain vehicle drivers of this hidden trap. Similarly, claimant in *Sega* failed to carry her burden by merely showing that the State failed to discover or warn about the defect in the park bridge railing which caused her injury. The court reasoned that "[t]he standard imposed by section 9-103 requires a graver act than mere negligence before liability may be imposed" (60 NY2d 183, 192-193, *supra*).

Based on the *Sega* decision (*supra*), contrary to claimant's contention, the State may not be held liable for its failure to warn of the dangerous marina currents based on the theory that the hidden currents were "known dangerous conditions". Though this theory may support a common-law negligence claim, it does not rise to the level of "willful or malicious" conduct as required by the statute. "Willful" conduct requires an intentional act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly

---

\* *Sega v State of New York* (60 NY2d 183) involved consolidated appeals of both *Sega v State of New York* (89 AD2d 412, affd 60 NY2d 183) and *Cutway v State of New York* (89 AD2d 406, revd 60 NY2d 183, mot for rearg den 61 NY2d 670).

probable that harm would follow (Restatement, Torts, § 500; Prosser and Keeton, Torts [5th ed], § 34). "Malicious" conduct requires conduct done intentionally without just cause or excuse (Black's Law Dictionary [4th ed], p 1110). Mere negligence is not enough (*Sega v State of New York, supra*). For these same reasons, claimant's theories based on the failure to properly supervise the marina and failure to provide lifesaving equipment were also properly dismissed.

Finally, we note that, since these claims arose prior to enactment of CPLR article 14-A, contributory negligence and assumption of the risk are absolute defenses to this action. The Court of Claims finding that the O'Keefes assumed the risks inherent in fishing from the marina walls is amply supported by the evidence. Thus, even if we were to find section 9-103 to be inapplicable and apply the standards of common-law negligence, claimant's action would be barred by assumption of the risk.

Accordingly, the judgment of the Court of Claims should be affirmed.

DILLON, P. J., and SCHNEPP, J., concur with HANCOCK, JR., J.; MOULE, J., dissents and votes to affirm the judgment in a separate opinion in which GREEN, J., concurs.

Judgments reversed, on the law, without costs, and matters remitted to Court of Claims for further proceedings in all of the above-entitled actions.