**Peter RAINS, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**No. CIV–88–153C.**

United States District Court,
W.D. New York.

July 19, 1990.

Lustig & Brown (David H. Paige and Maurice L. Sykes, of counsel), Buffalo, N.Y., for plaintiff.

Dennis C. Vacco, U.S. Atty. (Gretchen L. Wylegala, of counsel), Buffalo, N.Y., for defendant.

## BACKGROUND

CURTIN, District Judge.

Plaintiff Peter Rains brought this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, *et seq.* The plaintiff is seeking monetary damages for injuries he suffered when he fell into a "manhole" or "inspection hole" located on a breakwater in Buffalo Harbor that is maintained by the federal government.[1] According to the complaint, the plaintiff had traveled to the breakwater by boat in order to have a picnic on the structure. At the close of limited discovery relating to the issue of liability, *see* Item 8, the government filed the motion for summary judgment now pending before the court, asserting that New York's recreational-use statute, N.Y.GEN.OBLIG.L. § 9–103, renders it immune from liability.

## FACTS

The "Old Breakwater" is a stone and concrete navigational structure running 7000 feet from the mouth of Buffalo's outer harbor south along the Lake Erie shoreline. Item 11, Exhibit B at 8. Owned by the federal government and maintained by the United States Army Corps of Engineers, it is one-half to three-quarters of a mile from the Erie Basin Marina and completely surrounded by water. *Id.,* Exhibit B at 7, 12, 46. It can be reached by boat, by helicopter, or by swimming. *Id.,* Exhibit B at 48.

Originally constructed in the 1860s and modified in approximately 1889, the breakwater consists of a stone foundation with a concrete overlay. *Id.,* Exhibit B at 24–25. The concrete overlay has two levels, one close to the surface of the lake, and a second, higher level connected by steps to the first. *Id.,* Exhibit A at 50–51. The only structure built on the breakwater is a navigational device placed at the north end of the breakwater. *Id.,* Exhibit A at 74. The breakwater serves as a navigational aid and as protection for the Buffalo shoreline. *Id.,* Exhibit B at 41, 45, 63.

---

1. Although there appear to be discrepancies between the descriptions of the location of the breakwater provided by the parties in their filings, *compare* Item 11 at 3, 11, *with* Item 1 at ¶ 3, there does not appear to be any actual dispute as to which breakwater is at issue.

At intervals of from 100 to 300 feet along the breakwater, there are inspection holes cut in the surface of the concrete overlay to allow examination of the underlying rock structure forming the wall. *Id.*, Exhibit B at 14, 15. Some of the holes are covered by reinforced concrete lids while others are not. *Id.*, Exhibit B at 26, 27. As some of the covers have disappeared over the decades, it has been the policy of the Corps of Engineers to fill the holes with rock. *Id.*, Exhibit B at 27. The Corps of Engineers has estimated that, if left unfilled, these holes can be as much as four to six feet deep, depending on the level of the stone wall beneath. *Id.*, Exhibit B at 25. The filled holes may become deeper and require additional fill as the rocks settle or are forced out of the holes. Item 16 at 63. The plaintiff estimated that the hole he fell into was approximately eight feet deep and thirty inches wide. Item 11, Exhibit A at 58–60.

According to the government, the breakwater is not intended for recreational use; rather it was built and is maintained for navigational purposes only. *Id.*, Exhibit B at 41, 45. Nevertheless, the Corps of Engineers has not closed the breakwater to public use. Apparently with the knowledge of the Corps, the breakwater has been used by boaters for years. *Id.*, Exhibit A at 25, 32; Exhibit B at 41, 45; Item 1 at ¶ 8. In fact, there are iron rings and/or cleats on the breakwater for tying up boats, although it is not clear from the record who placed them there. Item 11, Exhibit A at 74; Item 16 at 59. There are no signs prohibiting use of the breakwater except at the far-north end of the structure, where for a few years several signs have been posted to keep people away from an area frequented by an endangered species of bird. Item 11, Exhibit B at 37–39. The plaintiff testified that he had visited the breakwater approximately five to ten times prior to the accident, and that the breakwater was sometimes used as a "central meeting place" for sailors. *Id.*, Exhibit A at 25, 32–33.

On the day of the accident, September 1, 1986, the plaintiff left the Erie Basin Marina in his sailboat with several guests aboard. *Id.*, Exhibit A at 3–8. It was his intention to sail for several hours and then to dock at the breakwater for a picnic with other sailors. *Id.*, Exhibit A at 20–22; Item 1 at ¶ 7. A flier had been passed around among Rains and other sailors suggesting a meeting at the breakwater that evening. Item 11, Exhibit A at 25, 28. At approximately 5:00 p.m., the plaintiff tied up his boat at the lower level of the breakwater and disembarked with his guests. There also were other boats tied up at the wall. *Id.*, Exhibit A at 21, 26–28, 38–40. The plaintiff and his guests then ate and drank for about an hour and a half on the lower level of the breakwater. *Id.*, Exhibit A at 42, 45–48.[2]

At about 6:30 p.m. the plaintiff climbed some stairs to the upper level, apparently intending to walk along the breakwater. *Id.*, Exhibit A at 50–52. After only a few steps on the upper level, while walking in one direction and looking in another due to a distraction, the plaintiff fell into an uncovered inspection hole. The plaintiff was able to break his fall into the hole with his hand and elbow, but injured his left knee during the fall. *Id.*, Exhibit A at 53, 56–61; Item 1 at ¶¶ 9–10. After receiving assistance from other people at the breakwater, the plaintiff returned to his boat, motored back to the marina, and drove home. Item 11, Exhibit A at 62, 65–66, 69–73, 75–76.

## DISCUSSION

The central issue is whether the breakwater and the plaintiff's activities fall within the purview of N.Y.GEN.OBLIG.L. § 9–103. That statute provides in relevant part that

> an owner, lessee or occupant of premises ... owes no duty to keep the premises safe for entry or use by others for hunting, fishing, organized gleaning ... canoeing, boating, trapping, hiking, cross-country skiing, tobogganing, sledding, speleological activities, horseback riding,

2. The plaintiff testified that he drank one beer during that time, and had had one other beer during the sail prior to reaching the breakwater. Item 11, Exhibit A at 22–23, 45, 64.

bicycle riding, hang gliding, motorized vehicle operation for recreational purposes, snowmobile operation ... or to give warning of any hazardous condition or use of or structure or activity on such premises to persons entering for such purposes....

*Id.* at § 9–103(1)(a). The statute does not, however, limit the liability that would otherwise exist "for willful or malicious failure to guard, or to warn against, a dangerous condition, use, structure or activity." *Id.* at § 9–103(2)(a).

The government argues that the plaintiff's use of the breakwater was "incidental" to his primary activity—sailing—and that his use falls within the activities covered by the statute. Item 11 at 6–9. *See also* Item 14 at 4–5. The government also contends that the breakwater is "the type of relatively undeveloped structure to which this statute was intended to apply," and, consequently, that it cannot be held liable because the complaint makes no allegation of a willful or malicious failure to guard or to warn. Item 11 at 6. *See also id.* at 10–11; Item 14 at 2–4.

The plaintiff responds that sailing and walking are separate and distinct activities and, therefore, that walking on the breakwater does not fall within the activities covered by the statute because "walking" is not explicitly mentioned in the law. Item 12 at 10–13. He also argues that the statute is addressed to relatively undeveloped land suitable for recreational activity. As a result, he claims, the breakwater does not fall within the statute because it continues to be used and maintained by the government to protect the harbor. Item 12 at 4–9.

On its face, § 9–103(1)(a) applies to any "owner, lessee or occupant of premises." It does not distinguish between different types of property. However, the New York Court of Appeals has concluded that the purpose and history of the statute place some limitations on its reach. According to the Court of Appeals, the purpose of the statute is "to induce property owners, who might otherwise be reluctant to do so for fear of liability, to permit persons to come on their property to pursue specified activities." *Ferres v. City of New Rochelle*, 68 N.Y.2d 446, 510 N.Y.S.2d 57, 60, 502 N.E.2d 972, 975 (1986). The statute applies only in circumstances where the basic purpose of the statute is satisfied. "[T]here is a quid pro quo—permission to [enter or use the premises] in return for the statutory immunity from liability." *Id.*, 510 N.Y.S.2d at 62, 502 N.E.2d at 977. In upholding a finding of liability against the City of New Rochelle in *Ferres*, the court concluded that a supervised public park operated and maintained for public use fell outside § 9–103. The court reasoned that the municipality needed no inducement to allow entrance onto its already-established and -supervised public facilities.

On the other hand, in *Iannotti v. Consolidated Rail Corp.*, 74 N.Y.2d 39, 544 N.Y.S.2d 308, 542 N.E.2d 621 (1989), the Court of Appeals found that property maintained for commercial use can fall within the statute's coverage. In that case, the plaintiff was injured while riding a motorized trail bike on a stone-and-dirt right-of-way adjacent to railroad tracks belonging to the defendant. The right-of-way, which formerly had served as a bed for another track, was used occasionally by railroad workmen as an access road for maintaining the existing tracks. The court framed the issue as follows:

> The question is whether—notwithstanding its contemporaneous commercial use—the property is the sort which the Legislature would have envisioned as being opened up to the public for recreational activities as a result of the inducement offered in the statute. In other words, is it a type of property which is not only physically conducive to the particular activity or sport but is also a type which would be appropriate for public use in pursuing the activity as recreation? If it is, application of General Obligations Law § 9–103 to such property as an inducement to the owner to make it available to the public would further the statutory purpose.

*Id.*, 544 N.Y.S.2d at 311, 542 N.E.2d at 624. Noting that the right-of-way had been used

for more than ten years for a number of recreational activities, *id.* at 312, 542 N.E.2d at 625, and that § 9–103 is not limited to remote, undeveloped, or wilderness areas, *id.* at 310, 542 N.E.2d at 623, the court found that including the right-of-way within the coverage of § 9–103 "would be consistent with the underlying purpose of inducing property owners to make their lands accessible to the public for recreational use." *Id.* at 312, 542 N.E.2d at 625.

In order for the breakwater involved in the present case to be covered by § 9–103, it thus must be found suitable for the activity of boating. The two questions at issue then are whether the breakwater is suitable for boating and whether boating encompasses picnicking and walking on the breakwater. They are essentially the same question. The breakwater is suitable for boating only if boating includes activities such as picnicking and walking on a breakwater surrounded by a lake.

The case law, while not directly answering the question, is instructive. Although some courts have strictly construed the activities enumerated in § 9–103, *see, e.g., Rochette v. Town of Newburgh*, 88 A.D.2d 614, 449 N.Y.S.2d 1013 (2nd Dep't 1982) (court refuses to include ice sailboat racing within the category of "boating," finding a clear legislative intent to "carefully delineate" covered activities and a "manifest desire for precision in this area") (*but see* dissent of J. Weinstein), the Court of Appeals has shown some flexibility in interpreting the statute. In *Sega v. State of New York*, 60 N.Y.2d 183, 469 N.Y.S.2d 51, 456 N.E.2d 1174 (1983), the court found that sitting and resting on a bridge railing, which collapsed, were "sufficiently related to traveling through the woods on foot to justify the conclusion that [the plaintiff] was 'hiking' when the accident occurred," and, therefore, that those activities fell within the coverage of the statute. *Id.*, 469 N.Y.S.2d at 56, 456 N.E.2d at 1179. Similarly, in *Curtiss v. County of Chemung*, 78 A.D.2d 908, 433 N.Y.S.2d 514 (3rd Dep't 1980), the Third Department read the statute relatively broadly. In that case, several boys were injured when a shed collapsed on them. They had been hiking and hunt-ing on the property and entered the shed to seek shelter from the cold. The court found that "[t]heir presence in the shed, when it collapsed, was incidental" to hunting and hiking, and that, therefore, the property owner was protected by § 9–103. *Id.*, 433 N.Y.S.2d at 515. *Cf. Cramer v. Henderson*, 120 A.D.2d 925, 503 N.Y.S.2d 207 (4th Dep't 1986) (walking away from swimming hole "sufficiently related and incidental to" swimming to bring activity outside § 9–103 since statute did not include "swimming") (citing *Sega* and *Curtiss*).

In the present case, the plaintiff, after sailing for several hours, used the breakwater to moor his boat temporarily while he and his guests joined others at the breakwater for a picnic. When the accident occurred, he was using the breakwater to take a walk. Moreover, the plaintiff himself described the structure as a "central meeting place" often used by boaters for such activities, and it also seems likely that the breakwater is used by boaters from time to time simply to rest or to tend to maintenance of their vessels.

As there is no allegation in the present case of a "willful or malicious failure to guard, or to warn against, a dangerous condition, use, structure or activity," the court believes that the New York Court of Appeals would find that the breakwater and the activities undertaken thereon by the plaintiff are covered by § 9–103. The court finds that, considering all the circumstances, the plaintiff's activities on the breakwater were sufficiently related and incidental to "boating" to fall within the ambit of the statute. Allowing boaters to use the breakwater for these types of activities appears to be the type of quid pro quo described in *Ferres* and *Iannotti* that § 9–103 was meant to encourage. *See* Item 11, Exhibit B at 52.

Accordingly, the defendant's motion for summary judgment is granted.

So ordered.